COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Friedman and Raphael
Argued at Lexington, Virginia


MI'SHAEL ELIJAH DAYE

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0925-21-3                      JUDGE FRANK K. FRIEDMAN
                                                        NOVEMBER 22, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Michael R. Doucette, Judge

(Thomas S. Leebrick; Thomas S. Leebrick, P.C., on brief), for
appellant.  Appellant submitting on brief.

Lucille M. Wall, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The trial court convicted appellant of possession with intent to distribute five or more

pounds of marijuana, possession of a firearm by a convicted non-violent felon, and possession of a

firearm while distributing or possessing with intent to distribute more than one pound of marijuana.[1]

Appellant argues that the trial court erred in denying his motions to suppress.  He also challenges

the sufficiency of the evidence to sustain his convictions.  For the following reasons, we affirm the

rulings of the trial court.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Poole v.*

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The Commonwealth dismissed one charge of receiving or concealing a stolen firearm.
Appellant also pled guilty to an unrelated drug charge and was sentenced on that case at the same
time as the cases at issue here.

*Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any of appellant's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

<u>The Incidents Surrounding Appellant's Arrest</u>

On November 17, 2018, Lynchburg Police Officer Sawyer and Detective Scott responded to a disorderly conduct call for a fight near appellant's apartment. The officers parked in appellant's driveway because it was the only available area on that side of the street to park out of the way of traffic. Upon exiting their vehicles, the officers immediately smelled a strong odor of fresh marijuana. The officers did not hear any noises indicating an ongoing disorder, and so they approached appellant's door to investigate both the disorderly conduct call and the marijuana odor.

As Officer Sawyer approached appellant's front door, the marijuana odor became stronger and more defined, and he saw what he believed at the time to be a smoking device in the window. Officer Sawyer knocked and kicked on the door and shouted for the door to be opened. Appellant then opened the door and walked onto the porch to show the officers where the alleged fight happened. Officer Sawyer asked appellant if they could go into the apartment and investigate the marijuana scent; appellant denied that there was marijuana inside. When Officer Sawyer asked if he could confirm there was "no weed," appellant asked whether the officers had a search warrant. The officers told appellant that they had probable cause, and when appellant did not immediately allow them to go inside, they added, "Okay, let's put it this way. We can either detain you and put you in cuffs and sit you on these steps for five hours while we go ahead and get [a warrant]." Appellant then said "go ahead" and sat on the steps. He stood a short time later and admitted that he had "smoked a little blunt."

One of the officers responded, "Is that it? That's all it is? So let me just—I'm gonna walk through and make sure." The officers then entered the apartment and saw a baseball-sized bag of marijuana in plain view on a coffee table in the first bedroom. They also saw marijuana "shake" and a trash bag containing suspected marijuana in a hallway. In the "back" bedroom, which belonged to Nashiem Clark, a firearm was found protruding from under the bed in plain view. In appellant's bedroom, they found a large amount of cash on the floor, the television stand, and in an open dresser drawer. They also saw a digital scale in the basement.

Officer Sawyer believed he needed a supervisor's approval to obtain a search warrant, but Detective Scott testified that he did not believe any such requirement existed. Detective Scott "locked down" the apartment while Officer Sawyer, who had received permission from a supervisor, obtained a search warrant. While executing the search warrant that same night, the police entered Clark's bedroom and found a Glock handgun under the covers of the bed with a thirty-round magazine, another Glock handgun in a dresser drawer with various ammunitions and magazines, and multiple bags matching the bags eventually found in the basement. In appellant's bedroom, police found cash totaling $3,423, marijuana shake on the television stand, burnt "roaches," and a backpack containing small, empty baggies and more marijuana shake. In a shared hallway, police found multiple trash bags filled with empty packaging and marijuana shake. In the basement, they found a large amount of marijuana individually packaged in various sizes, clear plastic baggies, a third Glock handgun, and a backpack filled with ammunition. Appellant told Officer Sawyer that he and his girlfriend had the cash for a trip they were taking.

<u>Appellant's Motion to Suppress and the Circuit Court's Ruling</u>

Appellant moved to suppress any evidence found within his apartment as the product of an unconstitutional search. After a hearing on his motions, the trial court found that appellant did not consent to the initial search, the officers' initial entry into the apartment was unlawful, and a

protective sweep of the apartment was not justified.[2]  However, the court also found that both

Officer Sawyer and Detective Scott detected "the strong smell of" marijuana as soon as they got out

of their car and that they localized the smell to appellant's residence before he even opened the

door.  When appellant did open the door, the police smelled marijuana coming from inside his

home.  The court concluded that the evidence should not be suppressed, despite the unlawful entry

into appellant's home, because it "inevitably would have been discovered by lawful means."

The court held that "the leads making the discovery inevitable were possessed by the police

at the time of the misconduct," noting that a strong odor of marijuana had been localized to the

interior of the residence, and that "there was a reasonable probability that [the evidence] would have

been discovered by lawful means but for the police misconduct . . . ."  In a written ruling, the court

noted that Sawyer's "decision to pursue the search warrant was independent of what he saw

during the unlawful search."  The trial court noted Sawyer's testimony that he believed he had

appellant's consent to enter the apartment—even writing in the search warrant affidavit that

appellant had given consent—and his testimony that he believed the search of appellant's

residence to be justified as a protective sweep.[3]  The court reasoned that

---

[2] On appeal, the Commonwealth does not dispute the trial court's findings that appellant did not give valid consent and that the police were not entitled to perform a protective sweep.

[3] Under *Segura v. United States*, 468 U.S. 796, 809-10 (1984), when probable cause exists to believe that evidence of criminal activity is present inside a dwelling, officers may secure the dwelling "to prevent the destruction or removal of evidence while a search warrant is being sought."  However, this does not negate the additional requirements necessary for officers to perform a protective sweep or a search. *Id.*; *see also Maryland v. Buie*, 494 U.S. 325, 335 (1990); *Verez v. Commonwealth*, 230 Va. 405, 410-11 (1985).  The trial court found that *Segura* did not apply because in *Segura* "the information in the search warrant affidavit came completely from sources wholly unconnected with the entry and was known by law enforcement well before the initial entry."  Here, the warrant included some items spotted during the improper entry and, because the officers believed they had consent, the initial entry was not limited simply to securing the premises.  The court also found that when the officers first entered the house, they did not have reason to believe that anyone else was in the house who might remove or destroy contraband.  (Notably, however, several individuals were in the house and one fled out the back door when the police appeared.)

> [w]hile [Sawyer's] subjective beliefs alone could never legitimize the search, his beliefs are relevant to show the inevitability of his actions. In spite of his belief that his search was already justified and lawful as both a consent search and a protective sweep, he still went before the magistrate to obtain a search warrant.

The court also concluded that the magistrate would have issued the search warrant based solely on the evidence the officers obtained before the unlawful entry into the apartment. Accordingly, the trial court denied the motions to suppress.

### The Trial Proceedings

At trial, Clark testified that he sold marijuana and appellant was his supplier. Clark stated that he was at the apartment when the police arrived and fled through the basement, but appellant later called and told him to return to the apartment to claim the firearms because appellant was a felon. Clark testified that the backpack and firearm found in the basement belonged to him, but he did not put either item there. Clark stated that one of the firearms found in his bedroom belonged to appellant; Clark did not know how it ended up in his bedroom but testified that appellant usually carried it when he was selling marijuana. Clark stated that appellant split the marijuana up into pounds and gave a portion to Clark to sell. He testified that three pounds of the marijuana found in the house belonged to him and that the rest—well over five pounds—belonged to appellant.

Appellant moved to strike the Commonwealth's evidence, arguing that Clark's testimony was not credible because he "had every incentive in the world" to testify against appellant and, without that testimony, the Commonwealth could not prove that appellant possessed the guns and marijuana. The trial court denied the motion and convicted appellant of possession with intent to distribute five or more pounds of marijuana, possession of a firearm by a convicted non-violent felon, and possession of a firearm while distributing or possessing with intent to distribute more than one pound of marijuana.

ANALYSIS

## I. Motions to Suppress

Appellant argues that the trial court erred in denying his motions to suppress. He asserts that the inevitable discovery doctrine was not applicable because Officer Sawyer's ability to obtain a search warrant hinged on the approval of a supervisor and too many variables existed that could have impacted a supervisor's determination to authorize a warrant.

### A. Standard of Review

"When reviewing the denial of a motion to suppress, 'we view the evidence in the light most favorable to the Commonwealth.'" *Ray v. Commonwealth*, 74 Va. App. 291, 302 (2022) (quoting *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019)). "Our review includes 'evidence adduced at both the trial and the suppression hearing.'" *Id.* (quoting *Carlson v. Commonwealth*, 69 Va. App. 749, 758 (2019)). "We give deference to the trial court's factual findings and review *de novo* the application of law to those facts." *Id.* (quoting *Joyce v. Commonwealth*, 72 Va. App. 9, 14 (2020)).

### B. The Fourth Amendment and Exceptions to the Exclusionary Rule

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "If[] . . . the trial court determines a search was conducted in violation of the Fourth Amendment, the evidence is subject to the exclusionary rule, which prohibits the introduction of evidence, tangible or testimonial, acquired during an unlawful search." *Carlson*, 69 Va. App. at 758 (citing *Murray v. United States*, 487 U.S. 533, 536 (1988)). Even so, "'simply because [evidence] would not have come to light but for the illegal actions of the police' does not mean that the evidence is automatically excluded." *Id.* at 759 (quoting *Fitchett v. Commonwealth*, 56 Va. App. 741, 746 (2010)). "Exclusion of evidence is a last resort rather than first impulse." *Id.* (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The inevitable discovery doctrine is an exception to the exclusionary rule and allows "evidence obtained by unlawful means [to be admitted] if that evidence or information 'ultimately or inevitably would have been discovered by lawful means.'" *Id.* at 763 (quoting *Commonwealth v. Jones*, 267 Va. 532, 536 (2004)). If the prosecution demonstrates that the evidence inevitably would have been discovered by lawful means, it "would reject logic, experience, and common sense" to exclude the evidence in an attempt to deter police misconduct. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The exclusionary rule does not operate to "put the police in a worse position than they would have been in if no unlawful conduct had transpired." *Id.* at 445.

To prove that evidence inevitably would have been discovered by lawful means, "the Commonwealth must show '(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct' and '(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct.'" *Knight v. Commonwealth*, 71 Va. App. 771, 788 (2020) (quoting *Carlson*, 69 Va. App. at 763). The dissent focuses on the existing split of authority among jurisdictions regarding the appropriate standard that the prosecution must meet to show that the evidence ultimately would have been discovered by lawful means. Virginia courts, along with the Fifth and Eighth Circuits, follow the rule that the prosecution must show "a reasonable probability" that the evidence would have been discovered by lawful means but for the police misconduct. *See, e.g.*, *Carlson*, 69 Va. App. at 763; *Knight*, 71 Va. App. at 788; *see also United States v. Jackson*, 596 F.3d 236 (5th Cir. 2010); *United States v. Smith*, 21 F.4th 510 (8th Cir. 2021). Other jurisdictions require a higher standard of proof—an approach which ensures that rule-bending is not rewarded or encouraged under exceptions to the exclusionary rule. *See, e.g.*, *United States v. Almeida*, 434 F.3d 25, 29 (1st Cir. 2006) (noting that "the government must demonstrate, to a high degree of

probability, that the evidence would have been discovered"); *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (rejecting the "reasonable probability" framework and finding that "the inevitable discovery doctrine is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred"); *United States v. Watkins*, 10 F.4th 1179, 1182 (11th Cir. 2021) (finding that *Nix*, 467 U.S. 431, requires use of the "preponderance of the evidence" standard and that "reasonable probability" is an impermissibly low standard of proof).

As the dissent points out, in *Walls v. Commonwealth*, 2 Va. App. 639 (1986), Virginia adopted the Fifth Circuit's three-prong test for the inevitable discovery doctrine. *Id.* at 656 ("(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation" (quoting *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985))). Later, *Jones*, 267 Va. 532, overturned *Walls* and, citing *Nix*, rejected the third prong of this test. Notably, *Jones* did not overturn any other prong of this test—including the "reasonable probability" standard. Our post-*Jones* cases continue to employ this now-two-prong test. *See Carlson*, 69 Va. App. at 763; *Knight*, 71 Va. App. at 788. Without any indication that the "reasonable probability" standard has been overturned in Virginia, we are bound by the interpanel accord doctrine and are thus required to employ the "reasonable probability" standard. *See Sandoval v. Commonwealth*, 64 Va. App. 398, 419 (2015) (noting that the interpanel accord doctrine precludes the overruling of a published decision of a panel of the Court of Appeals other than by the Court of Appeals sitting *en banc* or by the Supreme Court of Virginia).

While the dissent argues that the use of the "reasonable probability" standard in *Carlson* and *Knight* was mere dicta because the outcome in each of these cases did not turn on "the difference between 'reasonable probability' and 'inevitable discovery,'" *infra* at 27, we note that the interpanel accord doctrine "applies not merely to the literal holding of the case, but also to its *ratio decidendi*—the essential rationale in the case that determines the judgment." *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73-74 (2003); *Hutton v. Commonwealth*, 66 Va. App. 714, 724 n.5 (2016). Again, as none of our prior caselaw has indicated that the "reasonable probability" standard has been overturned in Virginia, we find ourselves bound by it.

## C. The Trial Court Did Not Err in Denying the Motion to Suppress

The record in this case supports the trial court's conclusion that the inevitable discovery doctrine operates to allow the disputed evidence to be admitted because there was a reasonable probability that Officer Sawyer would have obtained and executed a search warrant, finding the contraband within the apartment, using only the information he obtained before the warrantless and unlawful entry. "It is well established that '[t]he inclusion of tainted evidence [in an affidavit] does not invalidate a search warrant.'" *Williams v. Commonwealth*, 26 Va. App. 612, 619 (1998) (quoting *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993)). "[S]uppression is not required 'if, excluding the illegally obtained information, probable cause for the issuance of the warrant could still be found.'" *Id.* (quoting *United States v. Apple*, 915 F.2d 899, 910 (4th Cir. 1990)).[4]

---

[4] There are alternative theories under which this case could be viewed and analyzed. First, an argument could be made that under the good faith exception to the exclusionary rule, the police here permissibly relied upon a valid search warrant. The exclusionary rule does not require suppression of evidence "when a police officer, acting in objective good faith, obtains a search warrant from a magistrate and conducts a search within the scope of the warrant." *Polston v. Commonwealth*, 255 Va. 500, 503 (1998) (citing *Derr v. Commonwealth*, 242 Va. 413, 422 (1991)). "An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith." *Adams v. Commonwealth*, 275 Va. 260, 273 (2008) (quoting *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002)). Similarly, this case could be argued

1. <u>At the Time of the Search of Appellant's Residence, the Officers had Probable Cause to Believe Contraband was Present Inside the Dwelling</u>

"Under the Fourth Amendment, 'probable cause may be supported by the detection of distinctive odors, as well as by sight.'" *Bunch v. Commonwealth*, 51 Va. App. 491, 496 (2008) (quoting *United States v. Haynie*, 637 F.2d 227, 234 (4th Cir. 1980)). At the time of the search of appellant's residence, the law in Virginia held that "the detection of the odor of burning marijuana emanating from the open door of a residence, by a credible law enforcement officer who is familiar with its smell, provides that officer with probable cause to believe contraband is present inside the residence." *Cherry v. Commonwealth*, 44 Va. App. 347, 357-58 (2004) (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948)).[5]

---

as an example of independent, rather than inevitable, discovery. The affidavit for the search warrant contained facts establishing probable cause for the issuance of a warrant, independent of any facts obtained during the officers' illegal entry. Thus, one could assert that the warrant was in no way dependent upon or derived from the illegal entry.

However, both appellant and the Commonwealth exclusively rely on inevitable discovery in making their arguments and the trial court did not address these alternative theories below. We decline to address these issues "that have never been argued or briefed by counsel." *Epps v. Commonwealth*, 46 Va. App. 161, 178 n.3 (2005), *aff'd on reh'g en banc*, 47 Va. App. 687 (2006), *aff'd*, 273 Va. 410 (2007). Moreover, we are hesitant to intrude upon issues such as the good faith exception to the exclusionary rule here, where the trial court made findings that it was "appalled" by the officers' conduct and refused to "condone the methods used by the Lynchburg Police Department in this particular manner in any way, shape or form." We limit our review to the inevitable discovery arguments which the parties have presented.

[5] Appellant filed two motions to suppress the evidence, which were joined together and heard on two separate days—August 21, 2020, and September 3, 2020. At that time, the principles of *Cherry* still applied. Effective March 1, 2021, Code § 18.2-250.1 was amended to include subsection (F), which made evidence inadmissible that was discovered during a search based solely on the odor of marijuana. 2020 Va. Acts. Spec. Sess. 1, chs. 45, 51. A few months later, effective July 1, 2021, Code § 18.2-250.1 was repealed and the language previously found in subsection (F) was recodified at Code § 4.1-1302, with the additional provision that no search warrant may issue based solely on the odor of marijuana. 2021 Va. Acts. Spec. Sess. 1, chs. 550-51. This Court recently held in *Montgomery v. Commonwealth*, 75 Va. App. 182, 200 (2022), that Code § 18.2-250.1(F) does not apply retroactively to searches that occurred prior to its amendment. Here, appellant does not contend that Code § 4.1-1302 is retroactive or applies to this case.

Here, Officer Sawyer detailed in his sworn affidavit supporting the search warrant that he smelled fresh marijuana immediately after exiting his vehicle in appellant's driveway. His affidavit also stated that "upon approaching [appellant's] residence it was determined the odor was coming from the residence" and that the odor "was detected emanating from inside the residence" after appellant opened the door. That information was obtained before the unlawful entry into the apartment and provided Officer Sawyer with probable cause to believe that there was contraband inside the apartment.

2. The Record Establishes that the Officers Would have Sought and Obtained a Search Warrant if Appellant had Denied Them Entry into the Home

While, as the dissent notes, the existence of probable cause is not sufficient to prove inevitable discovery "when the government presents *no* evidence that the police would have obtained a warrant," *White v. Commonwealth*, 66 Va. App. 333, 364 n.7 (2016) (quoting *United States v. Allen*, 159 F.3d 832, 842 (4th Cir. 1998)), *rev'd on other grounds*, 293 Va. 411 (2017), here Officer Sawyer testified that if he had been denied entry into the home, he would have sought a search warrant.[6] The dissent correctly notes that Officer "Sawyer testified that he did not make

_____

[6] The dissent argues that a subjective standard should control the question of whether evidence would inevitably have been discovered. However, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . ." *Nix*, 467 U.S. at 444 n.5. Additionally, "the Fourth Amendment regulates conduct rather than thoughts . . . ." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (citations omitted) (noting that "special-needs and administrative-search cases" are exceptions to this rule). While an inevitable discovery analysis involves inquiring into objective facts, it may also involve testimony regarding an officer's subjective intentions. *See, e.g.*, *Nix*, 467 U.S. at 449-50 (search team was approaching the location of the victim's body); *Jones*, 267 Va. at 537 (police procedure would have required officer to run criminal background check, which would have led to defendant's arrest and subsequent search); *see also Murray*, 487 U.S. at 540 n.2 (analyzing an officer's subjective intentions to determine the applicability of the independent source doctrine). While the dissent in this case makes persuasive arguments for using a subjective inquiry to determine the applicability of the inevitable discovery doctrine, there are dangers to this approach. We "must keep sight of the practical effect admission will have on the incentives facing law enforcement officers to engage in unlawful conduct." *Id.* at 545 (Marshall, J., dissenting). As Justice Marshall noted:

the decision to seek a warrant until five minutes after he entered and saw contraband 'in plain view'"[7] and that he further testified that, had appellant not given consent, the officers would have

> It normally will be difficult for the trial court to verify, or the defendant to rebut, an assertion by officers that they always intended to obtain a warrant, regardless of the results of the illegal search. The testimony of the officers conducting the illegal search is the only direct evidence of intent, and the defendant will be relegated simply to arguing that the officers should not be believed.

*Id.* at 547-48 (Marshall, J., dissenting). Applying a purely subjective test would seem to favor officers who genuinely believe rule-bending is appropriate and departments that might train them to think so.

When the evidence is viewed in the best light to the Commonwealth, here, we are satisfied that the officers would have obtained a search warrant if not for the illegal entry into appellant's home. We do not grant "dispositive effect" to Officer Sawyer's testimony that he would have attempted to obtain a search warrant if appellant had denied the officers entry. *Id.* at 540 n.2. However, his testimony is corroborated by other, more objective evidence. Officer Sawyer also testified that, when the odor of marijuana was present, standard operating procedure was to secure the residence, contact a supervisor, and then get a search warrant. He testified that generally, supervising officers "always let us go get the search warrant." And Detective Scott testified that he did not believe he needed a supervisor's permission to seek a search warrant at all.

> Circumstances justifying application of the "inevitable discovery" rule are most likely to be present if these investigative procedures were already in progress prior to the discovery via illegal means, as in *Nix v. Williams*, or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.

6 Wayne R. LaFave, *Search & Seizure* § 11.4(a) (6th ed. 2021). Here, the officers' testimony regarding their established procedures demonstrated that they would have obtained a search warrant had appellant turned them away at the door.

Finally, even if we were to apply the dissent's subjective inquiry pursuant to *Murray*, we would necessarily reach the same conclusion. Officer Sawyer's testimony regarding his subjective intent was that he would have attempted to obtain a search warrant had appellant denied the officers entry. This testimony was not "implausible." *Murray*, 487 U.S. at 540 n.2.

[7] While the search warrant here was in fact partially "prompted by what [the officers] had seen during the initial entry," *Carlson*, 69 Va. App. at 761 (quoting *Murray*, 487 U.S. at 542), this does not end our inquiry. Instead, we must ask what would have inevitably occurred had no unlawful police conduct taken place. As explained below, the evidence indicates that, had the

still entered the apartment, secured it, and then contacted a supervisor to describe any evidence "observed in plain view." However, after this testimony, Officer Sawyer testified on re-cross examination: "If [appellant] had denied consent, I would attempt to obtain the search warrant."

Thus, based on Officer Sawyer's testimony, we are left with two possible scenarios for what would have occurred had appellant denied the officers entry into the home—that the officers either would have secured the apartment and contacted a supervisor about obtaining a warrant, or would have simply attempted to get a search warrant themselves.

> When reviewing a denial of a motion to suppress evidence, an appellate court considers the evidence in the light most favorable to the Commonwealth as the party that prevailed in the trial court, and the appellate court accords the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.

*Brown v. Commonwealth*, 68 Va. App. 517, 523 (2018). Taking Officer Sawyer's testimony in the light most favorable to the Commonwealth, and according to the Commonwealth "all reasonable inferences fairly deducible" therefrom, Officer Sawyer flatly stated that he would have attempted to get a search warrant if appellant had denied the officers entry.

We also note that when the trial court ruled on the admissibility of the evidence, it specifically considered the body camera video footage. A review of that video shows that, upon arrival on the front porch of the home, Officer Sawyer began knocking and kicking on the door and demanding that the door be opened. The officers commented that they saw what appeared to be a pipe in the window of the home. And when appellant opened the door and offered to show the officers where the alleged fight occurred, the officers stopped him, informed him that they smelled marijuana and saw "a bowl" in the window, and asked to come inside "and get this weed out of your house."

---

officers not entered the home, there is a reasonable probability that they would have sought and obtained a search warrant.

- 13 -

"As factfinder, a trial court views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). Here, the body camera video shows that the officers almost immediately began to focus on the odor of marijuana rather than the original call regarding a fight. They informed appellant that they had probable cause to search the residence based on the odor and what they believed to be drug paraphernalia in the window. A rational factfinder considering this video could easily conclude that the officers would not have simply walked away if appellant had not allowed them to enter the home; to the contrary, they were highly focused on identifying the source of the strong odor of marijuana. This conclusion is, again, bolstered by Officer Sawyer's testimony that he "would attempt to obtain the search warrant" if appellant had not given consent.

Finally, had Officer Sawyer attempted to get a search warrant at this stage—without ever entering appellant's home—the magistrate likely would have issued the warrant because the odor alone provided probable cause to believe there was marijuana inside the apartment. *Knight*, 71 Va. App. at 788 (quoting *Carlson*, 69 Va. App. at 763). Accordingly, under the specific facts of this case, there was "a reasonable probability" that the evidence at issue would have been discovered by lawful means but for the officers' illegal conduct.

3. It was Not Error for the Trial Court to Reject Appellant's Claims that No Reasonable Probability Existed that the Contraband Inevitably Would Have Been Discovered

Appellant, relying on *Knight*, argues that it was not inevitable that Officer Sawyer would have obtained a search warrant because he needed the approval of a supervisor, who could have denied the request for various reasons. In *Knight*, police officers used an inventory search of a vehicle as a pretext for a warrantless search when they lacked probable cause. *Id.* at 784. We held

that the inevitable discovery rule did not justify the warrantless inventory search where the officers had no probable cause to search the vehicle in the first place. *Id.* at 784-85. Given the lack of probable cause, the record did not show that the gun ultimately found within a backpack in the car "would have *inevitably* been discovered if the officers had not had an investigatory desire to search the car." *Id.* at 791. We emphasized that the car was not evidence of a crime and did not need to be impounded and Knight's passenger could have taken possession of the backpack where the gun was located. *Id.*

Appellant argues that, as in *Knight*, too many variables—including manpower, policy, and enforcement issues—could have caused a supervisor not to authorize a warrant in this case. The officers, however, did not testify—nor were they ever asked—whether any of these variables would affect their ability to obtain a search warrant. While Officer Sawyer testified that it was standard operating procedure to obtain approval from a supervisor before seeking a search warrant, he also testified that "generally they always let us go get the search warrant." Furthermore, Detective Scott testified that he did not believe it was necessary to seek supervisor approval at all. Accordingly, the record establishes a reasonable probability that the evidence would have been inevitably discovered through the execution of a valid search warrant.[8]

---

[8] As the dissent notes, the officers engaged in coercive tactics, leading the trial court to state that it was "appalled" by their behavior. In ruling the evidence is admissible, we do not condone the officers' conduct in this case. However, we defer to the United States Supreme Court's assertion that, if the inevitable discovery doctrine applies, it "would reject logic, experience, and common sense" to exclude the evidence and to put law enforcement in a worse position than it would have been absent the misconduct. *Nix*, 467 U.S. at 444-45.

The officers' testimony and the body camera footage indicate that the officers were determined to investigate the source of the marijuana odor. Officer Sawyer testified that he would have attempted to get a search warrant if appellant had refused the officers entry. And at the time of these events, the odor of marijuana would have provided sufficient probable cause for a search warrant to issue. Thus, the specific factual circumstances of this case give rise to a reasonable probability "that the evidence in question would have been discovered by lawful means but for the police misconduct." *Knight*, 71 Va. App. at 788 (quoting *Carlson*, 69 Va. App. at 763). We therefore conclude that the evidence is admissible, despite the questionable tactics utilized by the police in this case.

## II. Sufficiency of the Evidence

Appellant argues that the trial court erred in overruling his motion to strike based on the sufficiency of the evidence. Appellant asserts that Clark's testimony is incredible and unworthy of belief because some of his testimony contradicted his prior statements to police and he would say anything to lessen his own sentence.

### A. Standard of Review

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"Determining the credibility of witnesses . . . is within the exclusive province of the [factfinder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the factfinder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it

unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Accordingly, "[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (citing *Juniper*, 271 Va. at 415). Instead, such inconsistencies are appropriately weighed and "'resolved by the fact finder,' not the appellate court." *Id.* (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). In making a credibility determination, the factfinder "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (*en banc*) (citing *Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991)).

B. <u>The Evidence was Both Sufficient and Credible to Support Appellant's Convictions</u>

Appellant points to nothing that renders Clark's testimony inherently incredible as a matter of law. Although he claims that Clark's trial testimony was inconsistent with what he reported to police on the night of the incident, that circumstance was properly submitted to and "resolved by the fact finder." *Kelley*, 69 Va. App. at 626. To the extent there was any inconsistency in Clark's testimony, "[t]he mere fact that a witness may have . . . given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper* 271 Va. at 415. Additionally, Clark's potential motives for testifying were properly weighed by the trial court as part of its determination of Clark's credibility. Such inconsistencies and

- 17 -

circumstances are "appropriately weighed as part of the entire issue of witness credibility, which is left to the [factfinder] to decide." *Id.* (citing *Shelton v. Mullins*, 207 Va. 17, 22 (1966)).

After balancing all the evidence, the trial court found that Clark's testimony was "corroborated over and over again" by other evidence. "When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). Where witnesses give testimony that, if true, is sufficient to maintain the verdict, and "the trier of the facts sees fit to base the verdict upon that testimony[,] there can be no relief in the appellate court." *Id.* at 718-19 (quoting *Swanson*, 8 Va. App. at 379). The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to sustain his convictions.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed*.

Raphael, J., dissenting.

Because I believe that the majority has applied the wrong legal standards, I respectfully dissent. The "reasonable probability" standard that the trial court applied—and which the majority now ratifies—dilutes the "inevitable discovery" standard mandated by *Nix v. Williams*, 467 U.S. 431 (1984). Put simply, the fact that something is *reasonably probable* does not make it *inevitable*. Moreover, *Murray v. United States*, 487 U.S. 533 (1988), requires that courts apply a subjective standard when determining whether police inevitably would have sought and obtained a lawful warrant had they not been permitted to undertake the unlawful search. The question is what the particular officer or officers would have done, not what a reasonable officer under the circumstances would have done. I would vacate the convictions and remand the case for the trial court to reconsider the evidence under those standards.

I.

"The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced." *Davis v. United States*, 564 U.S. 229, 230-31 (2011). To "supplement the bare text," the United States Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Id.* at 231-32. The Court has recognized several exceptions to the exclusionary rule, including the good-faith exception, the attenuation doctrine, the independent-source rule, and the inevitable-discovery doctrine. *See generally* 6 Wayne R. LaFave, *Search & Seizure* § 11.4(a) (6th ed. 2021); Ronald J. Bacigal & Corinna Barrett Lain, *Virginia Practice Criminal Procedure* §§ 6:4, 6:6 (2021-2022 ed.).

This case involves the inevitable-discovery doctrine first recognized in 1984 by the Supreme Court in *Nix*, 467 U.S. at 444. As *Nix* explained, "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been

discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444. The inevitable-discovery doctrine thus serves to preserve those "convictions that would have been obtained without police misconduct." *Id.* at 443 n.4.

The inevitable-discovery doctrine "is in reality an extrapolation from the independent source doctrine." *Murray*, 487 U.S. at 539; *Nix*, 467 U.S. at 443 (stating that the two doctrines are "closely related"); *Wilkins v. Commonwealth*, 37 Va. App. 465, 475 (2002) (describing the inevitable-discovery doctrine as "an off-shoot of the independent source doctrine"). But the inevitable-discovery doctrine "differs in that the question is not whether the police *did in fact acquire* certain evidence by reliance upon an untainted source but instead whether evidence found because of an earlier violation *would inevitably have been discovered* lawfully." 3 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure* § 9.3(e) (4th ed. 2021) (emphasis added).

"Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (quoting *United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000)). The inevitable-discovery doctrine "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Nix*, 467 U.S. at 444 n.5.

## II.

I agree with the majority that, by the time appellant Elijah Daye opened his front door, Officer Sawyer had probable cause to believe that Daye illegally possessed marijuana inside the residence. When these events occurred in 2018, marijuana possession was illegal. And the

strong odor of marijuana outside the residence—together with the smell emanating from within—gave the police probable cause to think that a crime had been committed. *E.g.*, *Bunch v. Commonwealth*, 51 Va. App. 491, 496 (2008) ("As many courts have held, 'if an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana.'" (quoting *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004))).

But the existence of probable cause alone is not enough to show that the police would have inevitably sought and obtained a warrant to search the premises. As *Murray* makes clear, the trial court "must be satisfied that a warrant *would have been sought* without the illegal entry." 487 U.S. at 540 n.2 (emphasis added). The police in *Murray* illegally entered a warehouse where they spotted bales of marijuana in plain view. *Id.* at 535. The police then sought and obtained a warrant, seizing "270 bales of marijuana and notebooks listing customers for whom the bales were destined." *Id.* at 536. The affidavit in support of the warrant established probable cause based only on facts known to police before their illegal entry. *Id.* Still, the Court remanded the case for the district court to determine if police would have sought and obtained the warrant, but for the illegal entry. *Id.* at 542-44.

Following *Murray*, various courts, including ours, have recognized that probable cause alone is not enough to show that the police would have sought and obtained a warrant if they had not been permitted to conduct an illegal search. We said so, albeit in dictum, in 2016:

> [T]he "inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search *simply because probable cause existed to obtain a warrant* when the government presents no evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment."

*White v. Commonwealth*, 66 Va. App. 333, 364 n.7 (2016) (quoting *United States v. Allen*, 159 F.3d 832, 842 (4th Cir. 1998)), *rev'd on other grounds*, 293 Va. 411 (2017).

And that proposition is black-letter law in other jurisdictions. As the Fourth Circuit put it, "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019). Having "probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and of itself, renders a warrantless search valid." *Allen*, 159 F.3d at 841. "If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be any reason for officers to seek a warrant." *Id.* at 842 (quoting *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995)). The trial judge must "stand as gatekeeper, preventing officers from foregoing the warrant process entirely by always relying on inevitable discovery." *United States v. Christy*, 739 F.3d 534, 543 n.5 (10th Cir. 2014).[9]

---

[9] *See also, e.g.*, *United States v. Lundin*, 817 F.3d 1151, 1161-62 (9th Cir. 2016) ("The inevitable discovery exception does not apply when officers have probable cause to apply for a warrant but simply fail to do so. . . . Put differently, allowing the government to claim admissibility under the inevitable discovery doctrine when officers have probable cause to obtain a warrant but fail to do so would encourage officers never to bother to obtain a warrant."); *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994) ("[T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause."); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986) ("[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment."); *People v. Superior Court*, 213 Cal. Rptr. 3d 735, 748 (Cal. Ct. App. 2017) ("The trial court put the rule succinctly: '[T]he courts are saying . . . that when you have the choice, [to] go get a warrant or not, don't rely on the fact that I could have gotten one as your reason for not getting one.'"); *People v. Hyde*, 775 N.W.2d 833, 843 (Mich. Ct. App. 2009) ("To allow a warrantless search merely because probable cause exists would allow the inevitable discovery doctrine to act as a warrant exception that engulfs the warrant requirement.").

So the resolution of the inevitable-discovery question here necessarily turns on whether the police would have sought and obtained a search warrant had Daye refused them entry.

III.

I agree with the majority on the standard of appellate review. In reviewing the trial court's ruling denying Daye's suppression motion, the Court must give deference to the trial court's factual findings, but we must "review *de novo* the application of law to those facts." *Ray v. Commonwealth*, 74 Va. App. 291, 302 (2022) (quoting *Joyce v. Commonwealth*, 72 Va. App. 9, 14 (2020)). On de novo review of the court's application of law to the facts, I find that the trial court erred in concluding that the police would have sought and obtained a search warrant if Daye had denied them entry at the outset.

The trial court committed two legal errors in reaching that conclusion. First, the court did not find that Officer Sawyer's discovery of the contraband in the residence was *inevitable*, but only that "[t]here is a *reasonable probability* that Officer Sawyer would have discovered" it. Letter Opinion at 6 (emphasis added). Second, the trial court did not view the evidence about what Officer Sawyer would have done through the correct lens. The question is not what a reasonable officer in Sawyer's position would have done under the circumstances if Daye had refused the police entry, but what *Officer Sawyer* would have done. This error was not harmless. If the trial court had applied that subjective standard, it could have reasonably found that the Commonwealth failed to prove by a preponderance of evidence that Officer Sawyer would have sought and obtained a search warrant if Daye had not been coerced into consenting to the search of his home.

I would therefore remand the case for the trial court to apply the correct legal standards, described in greater detail below.

A.

Quoting *Commonwealth v. Jones*, 267 Va. 532 (2004), the trial court believed that the inevitable-discovery doctrine required the Commonwealth to show "a *reasonable probability* that the evidence in question would have been discovered by lawful means but for the police misconduct." Letter Opinion at 4-5 (emphasis added) (quoting *Jones*, 267 Va. at 536). As shown below, however, that language from *Jones* was dictum.

The United States Supreme Court did not use a "reasonable probability" formulation when it announced the inevitable-discovery doctrine in *Nix*. *Nix* instead requires the government to prove "by a preponderance of the evidence that the information *ultimately or inevitably would have been discovered* by lawful means." 467 U.S. at 444 (emphasis added). Most federal circuits follow that standard, not a reasonable-probability standard.[10] Only two federal circuits—

---

[10] *See United States v. Crespo-Rios*, 645 F.3d 37, 42 (1st Cir. 2011) ("in fact inevitable"); *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) ("[W]e now expressly eschew the 'reasonable probability' framework that some of our sister circuits have used to analyze 'inevitable discovery' cases."); *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020) ("ultimately or inevitably would have been discovered"); *United States v. Stabile*, 633 F.3d 219, 245-46 (3d Cir. 2011) (requiring that evidence "inevitably would have been discovered"); *Alston*, 941 F.3d at 137-38 (4th Cir.) ("ultimately or inevitably would have been discovered by lawful means," the occurrence of which "must have been likely, indeed 'inevitable'"); *United States v. Quinney*, 583 F.3d 891, 893-95 (6th Cir. 2009) (requiring proof that the information "ultimately or inevitably would have been discovered" (quoting *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008))); *United States v. Marrocco*, 578 F.3d 627, 639 (7th Cir. 2009) ("In this circuit, when the Government seeks 'to use the doctrine of inevitable discovery . . . ,' it must 'prove that a warrant would certainly, and not merely probably, have been issued had it been applied for.'" (quoting *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008))); *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) ("would have been obtained inevitably" (quoting *Nix*, 467 U.S. at 447)); *Souza*, 223 F.3d at 1205 (10th Cir.) ("a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means"); *United States v. Watkins*, 10 F.4th 1179, 1185 (11th Cir. 2021) (en banc) ("[W]e hold that the standard of predictive proof the government must satisfy in order to establish the proper application of the ultimate discovery exception is preponderance of the evidence, not reasonable probability."); *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007) ("would have been discovered anyway").

the Fifth and the Eighth—use a reasonable-probability formulation.[11]  And the Eighth Circuit itself borrowed that standard from the Fifth Circuit "with no analysis of the competing approaches to the doctrine or whether [the] Fifth Circuit's approach is consistent with *Nix v. Williams*."  *United States v. Thomas*, 524 F.3d 855, 861 (8th Cir. 2008) (Colloton, J., concurring).[12]

The reasonable-probability test "means something *less* than 'more likely than not,'" leading to a "substantial dilution of what the Supreme Court required in [*Nix*]."  6 LaFave, *Search & Seizure*, *supra*, § 11.4(a) n.153 (emphasis added) (citation omitted).  Various scholars have condemned the Fifth and Eighth Circuits' reasonable-probability standard as having "wandered" so "far off the mark" established by the Supreme Court that "they have essentially removed the requirement of inevitability from the inevitable discovery doctrine."  *Id.*; *see also* Tonja Jacobi & Elliot Louthen, *The Corrosive Effect of Inevitable Discovery on the Fourth Amendment*, 171 U. Penn. L. Rev. (forthcoming in 2023) (manuscript at 20), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4035683 ("By replacing 'inevitably' with 'reasonable probability,' not only do these tests introduce an entirely different, and significantly lower, requisite likelihood, but they also inherently contradict the doctrine's namesake.").

In 1986, our Court copied that version of the inevitable-discovery test from the Fifth Circuit, including the "reasonable probability" language.  *See Walls v. Commonwealth*, 2

---

[11] *See United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010); *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008).

[12] The Eighth Circuit case cited by the majority, *United States v. Smith*, 21 F.4th 510 (8th Cir. 2021), traces the "reasonable probability" standard to *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).  *See Smith*, 21 F.4th at 517.  *Conner*, in turn, borrowed the "reasonable probability" standard from *United States v. Wilson*, 36 F.3d 1298, 1304 (5th Cir. 1994).  And for the root of that precedent, *Wilson* cited *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985).  *See Wilson*, 36 F.3d at 1304.  As discussed below, *Cherry* is likewise the root cause of the majority's misapplication of the inevitable-discovery standard here.

Va. App. 639, 656 (1986) (quoting *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985)). The Fifth Circuit standard in *Cherry* included another element too: that police must have been "actively pursuing [an] alternative line of investigation" before the illegal search. *Id.* (quoting *Cherry*, 759 F.2d at 1204). Notably, however, the result in *Walls* did not depend on the difference between "reasonable probability" and "inevitability." The Court said that the Commonwealth there "failed to establish . . . that [the police] were actively pursuing an alternative line of investigation that *would inevitably have led* to the discovery of the evidence." *Id.* (emphasis added).

In 2004, *Jones* overruled our decision in *Walls*, noting that the Fifth Circuit's requirement that the police be actively pursuing an alternative line of investigation was not supported by *Nix*. *Jones*, 267 Va. at 537. *Jones* block-quoted the Fifth Circuit standard on which *Walls* relied, including the "reasonable probability" standard. *Id.* at 536. But *Jones* did not apply that standard. To the contrary, *Jones* found that the drugs in question there "ultimately and *inevitably* would have been discovered by lawful means." *Id.* (emphasis added) (quoting *Nix*, 467 U.S. at 444). Thus, *Jones*'s quotation of the reasonable-probability standard was not necessary to either the holding or the rationale for the decision. In other words, it was *obiter dictum*: "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." *Dictum— obiter dictum, Black's Law Dictionary* (11th ed. 2019).

Unfortunately, our Court has repeated that dictum by twice quoting *Jones*'s recitation of the Fifth Circuit standard. *See Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019) (quoting *Jones*, 267 Va. at 536); *Knight v. Commonwealth*, 71 Va. App. 771, 788 (2020) (quoting *Carlson*, 69 Va. App. at 763). As in *Jones*, the quotation of "reasonable probability" in *Knight* and *Carlson* was dictum.

- 26 -

The majority now mistakes that dictum for *Carlson* and *Knight*'s *ratio decidendi*—"the essential rationale in the case that determines the judgment." *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73-74 (2003). In truth, neither case depended on the difference between *reasonable probability* and *inevitably*; both cases turned on *inevitability*. *See Knight*, 71 Va. App. at 792 (holding that "the Commonwealth failed to prove the gun inevitably would have been discovered"); *Carlson*, 69 Va. App. at 765 ("[W]e cannot say the evidence would have ultimately or inevitably been obtained without police misconduct."). So neither *Knight* nor *Carlson* required that this Court repeat the Fifth Circuit's mistake.

B.

The majority also errs in suggesting that an objective inquiry determines whether evidence would inevitably have been discovered. *See* n.6 *supra*. It is true that in many if not most Fourth Amendment contexts, courts "do not examine the subjective understanding of the particular officer involved." *Mason v. Commonwealth*, 64 Va. App. 292, 302 (2015) (en banc) (quoting *Heien v. North Carolina*, 574 U.S. 54, 66 (2014)). But that is not true in all Fourth Amendment contexts. For example, a subjective standard applies to inventory searches, which police may not use as a ruse to discover incriminating evidence, nor to administrative inspections, which police may not use as a pretext to obtain evidence of a criminal violation. *See Whren v. United States*, 517 U.S. 806, 811 (1996); *see also* Orin S. Kerr, *The Questionable Objectivity of Fourth Amendment Law*, 99 Tex. L. Rev. 447, 451-66 (2021) (surveying Fourth Amendment doctrines that involve subjective inquiries).

The inevitable-discovery doctrine is another exception that demands a subjective inquiry. *Murray* requires that the trial judge determine "whether [a warrant] would have been sought even if what actually happened had not occurred." 487 U.S. at 542 n.3. It depends on what the officer would have done in that counterfactual situation. *Id.* at 540 n.2. In other words, "*Murray*

- 27 -

assumes that the question is the actual motivation or intention of the officers in the particular case," requiring "a subjective rather than an objective test." 6 LaFave, *Search & Seizure*, *supra*, § 11.4(f). "Federal circuit courts . . . have uniformly concluded" that a subjective standard applies to this determination. *Commonwealth v. Pearson*, 162 N.E.3d 645, 650 (Mass. 2021). As a leading scholar has put it, "lower courts have uniformly held that *Murray* requires a separate finding[] based on an inquiry into the state of mind of the officers seeking the warrant . . . ." 3 LaFave, *Criminal Procedure*, *supra*, § 9.4(b) n.81.[13]

_____

[13] *See, e.g.*, *United States v. Siciliano*, 578 F.3d 61, 69 (1st Cir. 2009) ("[T]he first prong . . . is 'subjective,' concerning 'the police officers' intent,' in contrast to the objective determination of probable cause under the second prong." (quoting *United States v. Dessesaure*, 429 F.3d 359, 369 (1st Cir. 2005))); *United States v. Hill*, 776 F.3d 243, 252-53 (4th Cir. 2015) (remanding for factual determination on officer's intent to seek warrant); *United States v. Restrepo*, 966 F.2d 964, 972 (5th Cir. 1992) ("[U]nlike the objective test of whether the expurgated affidavit constitutes probable cause to issue the warrant, the core judicial inquiry . . . is a subjective one: whether information gained in the illegal search prompted the officers to seek a warrant . . . ."); *United States v. Markling*, 7 F.3d 1309, 1317-18 (7th Cir. 1993) (remanding for a finding under *Murray* whether the officer "would have applied for a warrant" if he had not illegally searched the defendant's briefcase); *Lauderdale v. State*, 120 S.W.3d 106, 112 (Ark. Ct. App. 2003) ("[T]he core judicial inquiry . . . is a subjective one . . . ." (quoting *Restrepo*, 966 F.2d at 972)); *People v. Weiss*, 978 P.2d 1257, 1261 (Cal. 1999) (interpreting *Murray* "to require a finding that the police subjectively would have sought the warrant even without the illegal conduct"); *People v. Schoondermark*, 759 P.2d 715, 719 (Colo. 1988) (en banc) (remanding for determination "whether the officers would have sought the warrant even if they had not entered the house and observed the incriminating evidence"); *Evans v. United States*, 122 A.3d 876, 885 (D.C. 2015) ("[T]he government bore the burden of proof on the question whether the police would have sought a warrant even if [the officer] had not entered the apartment."); *Pearson*, 162 N.E.3d at 650 ("a subjective inquiry"); *State v. Lieberg*, 553 N.W.2d 51, 57-58 (Minn. Ct. App. 1996) (remanding for determination whether "the police would have sought a warrant even in the absence of the information generated by the unlawful search"); *State v. Jurgens*, 454 N.W.2d 280, 282-83 (Neb. 1990) (remanding for further findings on officer's intent to seek search warrant); *State v. Holland*, 823 A.2d 38, 50 (N.J. 2003) (rejecting the prosecution's argument that the "officers would have sought the warrant regardless of their improper initial search" because both the officers' testimonies and the warrant affidavit reflected that they decided to seek the warrant based on what they had seen during the illegal search); *People v. Marinez*, 993 N.Y.S.2d 304, 305-06 (N.Y. App. Div. 2014) (ordering new trial where evidence showed that an unlawful search prompted officer to seek search warrant); *State v. Winkler*, 567 N.W.2d 330, 334 (N.D. 1997) ("a subjective, rather than objective test"); *State v. Lange*, 463 N.W.2d 390, 396-97 (Wis. Ct. App. 1990) (remanding for determination whether officer would have sought a warrant without the illegal search and seizure).

Failing to acknowledge the uniform weight of authority going the other way, the majority mistakenly relies instead on Justice Marshall's concern in his *Murray* dissent about the risk that a subjective standard might reward "rule-bending" police officers. *See* n.6 *supra*. To be sure, Justice Marshall worried that a subjective inquiry might "turn entirely on an evaluation of the officers' intent," making it "difficult for the trial court to verify, or the defendant to rebut, an assertion by officers that they always intended to obtain a warrant, regardless of the results of the illegal search." 487 U.S. at 547 (Marshall, J., dissenting). But the majority here overlooks the *Murray* majority's response to that concern—police "officers' assurances" would not be "dispositive . . . [w]here the facts render those assurances implausible." *Id.* at 540 n.2. In any event, the majority here cannot sidestep the subjective standard by relying on the dissenting opinion in a case that requires us to apply that subjective standard.

C.

Finally, when evaluating whether evidence inevitably would have been discovered had an illegal search not been permitted, trial courts should consider whether the failure to apply the exclusionary rule would reward police misconduct. *Nix* described the independent-source doctrine as an exception to the exclusionary rule to "put[] police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." 467 U.S. at 443. Likewise, the "purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Id.* at 443 n.4.

But the inverse is also true: courts must be vigilant to ensure that an unconstitutional shortcut has not put the police in a *better* position than if there had been no police misconduct at all. For instance, an officer is not categorically excused from obtaining a warrant to search a residence just because he has rock-solid probable cause. *See* Part II *supra*. Permitting officers to routinely forgo applying for a warrant in that situation "would essentially provide a free pass to

the police to violate a defendant's rights with no risk of having the evidence excluded." *Jones v. Commonwealth*, No. 1465-14-3, slip op. at 8, 2015 WL 7253652, at \*4 (Va. Ct. App. Nov. 17, 2015) (Humphreys, J., dissenting). Similarly, courts should deter a "'search first, warrant later' mentality." *Murray*, 487 U.S. at 540 n.2. Without a more rigorous application of the exclusionary rule, the police "might well view a warrantless search as a worthwhile shortcut because it would tell them whether it would be worth the bother of obtaining and executing the warrant." 3 LaFave, *Criminal Procedure*, *supra*, § 9.3(e).

## IV.

I would vacate the judgment and remand this case to the trial court to apply the correct legal standards set out in part III. The trial court should be directed to examine whether the Commonwealth carried its burden of proving that it was *inevitable*—not just reasonably probable—that Officer Sawyer would have sought and obtained a warrant had Daye refused to let the police search his residence.

The trial court should also be asked to reconsider the evidence under the subjective standard required by *Murray*. As the Commonwealth acknowledged at oral argument, *none* of the officers testified that they would have gotten the warrant if they had not entered the premises and seen the contraband. What is more, Officer Sawyer's testimony contradicts the claim that he would have sought and obtained a warrant if the police had not entered the residence illegally and seen large amounts of marijuana. Sawyer testified that he did not make the decision to seek a warrant until five minutes after he entered and saw contraband "in plain view." When asked what he would have done if he had not obtained permission to enter, Sawyer did not say that he would have applied for a warrant. He said, instead, that "we would have still [gone] inside, secured the residence," and "anything observed in plain view we would have then contacted the supervisor" to seek approval for the warrant. Sawyer made clear that seeing the contraband

during his "protective sweep" was the reason for his seeking the warrant. But the trial court found—and the Commonwealth does not dispute—that his entry was illegal because it was not authorized as a protective sweep.

The trial court credited that testimony. It found that Sawyer did not decide to get a search warrant until five minutes after he entered the residence, once he saw the contraband inside. The court further found that "the warrant was prompted by what [the police] had seen during the unlawful entry." We must defer to those factual findings. *Ray*, 74 Va. App. at 302. But far from supporting the trial court's inevitable-discovery determination, that testimony suggests "that the police decision . . . was prompted in part by the illegal search." *State v. Boll*, 651 N.W.2d 710, 719 (S.D. 2002).

The majority here has overlooked most of that testimony, relying instead on a follow-up statement by Sawyer at the suppression hearing that, "If [Daye] had denied consent, I would attempt to obtain the search warrant." But that statement must be understood in light of Sawyer's earlier testimony that he would have obtained a search warrant because he would have conducted the (illegal) protective sweep and would have seen contraband in plain view. Additional doubt that the police would have obtained a warrant without the illegal entry comes from the fact that the warrant affidavit included statements gleaned only from the illegal entry. Moreover, Sawyer said that his shift supervisor was "the one who makes the decision on getting a search warrant." The supervisor here, Sergeant White, "arrived at the scene at some point while the officers were still inside the apartment," and White approved the warrant sometime later. Yet the Commonwealth did not introduce evidence that White would have approved seeking a search warrant based only on the strong smell of marijuana at the front door.

Finally, the trial court should be asked to reexamine whether applying the exclusionary rule here is needed to deter police misconduct. The trial court found that the officers coerced

Daye into letting them search his residence, rendering his consent involuntary. The police told Daye that if he didn't consent, they would "detain [him] and put [him] in cuffs and sit [him] on these steps for five hours" while they got a warrant. That appears to have been a bluff; the magistrate issued the warrant here twenty-six minutes after Officer Sawyer filed his affidavit requesting it. The trial court said that it did "not condone the methods" used by the police and that it was "appalled" by their conduct. That is an unmistakable sign that deterrence may be necessary.

\* \* \*

In short, the question under *Murray* is whether the police would have sought and obtained a search warrant if Daye had denied them entry—based solely on what the police knew at the outset of the encounter, before they illegally searched his home. I "have no doubt" that Officer Sawyer *could have* sought a warrant when he smelled marijuana coming from inside the house, but whether he *would have* done so "presents an entirely different question." *Allen*, 159 F.3d at 840. In a case mirroring this one, the Supreme Court of New Hampshire held that the fact that the officers smelled marijuana coming from the home was not enough to show inevitable discovery without proof that the police would have actually sought and obtained a warrant. *State v. Davis*, 267 A.3d 1120, 1123, 1130 (N.H. 2021). The same is true here. Because "it is the function of the [trial court] rather than the Court of Appeals to determine the facts," *Murray*, 487 U.S. at 543, we should remand this case to the trial court to conduct the inevitable-discovery analysis under the correct legal standards.