COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff,[*] AtLee and Senior Judge Frank
Argued at Norfolk, Virginia

**PUBLISHED**

IAN CHRISTIAN CARLSON

v.          Record No. 2058-17-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RICHARD Y. ATLEE, JR.
FEBRUARY 12, 2019

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Frederick B. Lowe, Judge Designate[1]

Erik A. Mussoni, Assistant Public Defender, for appellant.

A. Anne Lloyd, Assistant Attorney General (Mark R. Herring,
Attorney General; Elizabeth Kiernan Fitzgerald, Assistant
Attorney General, on brief), for appellee.


Ian Christian Carlson appeals his convictions for manufacturing marijuana in violation of

Code § 18.2-248.1 and misdemeanor obstruction of justice for using a police radio during the

commission of a crime in violation of Code § 18.2-462.1.  Carlson argues that the trial court

erred in denying his motion to suppress evidence obtained as a result of an unlawful search of his

residence.  He also argues that the evidence was insufficient to convict him of manufacturing

marijuana.  We agree the trial court should have granted Carlson's motion to suppress, and we

now reverse the trial court.

---

[*] On January 1, 2019, Judge Decker succeeded Judge Huff as chief judge.

[1] Judge Lowe presided over the trial and signed the final sentencing order.  Judge
Marjorie Taylor Arrington ruled on the motion to suppress and signed the order denying the
motion.

I. BACKGROUND

Officers Matt Elliot and Aaron Gosnell responded to a call at a trailer park on the 2700 block of Ike Street in Chesapeake. When the officers parked and got out of their vehicles at the scene, they immediately noticed a strong odor of marijuana. The officers responded to the original, unrelated call and then attempted to locate the source of the marijuana smell. The officers walked around each trailer, sniffing at the doors and windows, in an attempt to localize the odor to a particular trailer. Each trailer was situated approximately ten to fifteen feet apart. As the officers walked towards trailer 65, Carlson's residence, the officers noticed that the smell was getting stronger.

Carlson's trailer is located at a T-intersection. The officers walked around a van parked at the curb in front of the trailer and onto Carlson's property. Carlson's trailer is set twenty-two feet from the curb, and the front door is thirty-six feet from the curb. As they had done at each of the other trailers, the officers sniffed the doors and windows. After sniffing the doors and windows, "it became obvious" to the officers that the odor was coming from Carlson's trailer.

The officers notified their sergeant and then contacted Vice and Narcotics. The sergeant ordered the officers to "make contact" with the trailer. Accordingly, the officers knocked on the door and announced themselves as police officers. No one answered the door, but the officers heard a radio or television turn off. At some point, the blinds flickered up and down. The officers secured the premises and waited for backup to arrive.

In response to the officers' call, Detective Cusumano from Vice and Narcotics arrived approximately one hour later. At trial, Detective Cusumano testified that he was called to assist with a trailer that smelled of marijuana. When he arrived, he saw other police units on scene. The detective walked up to the main entrance of Carlson's trailer and smelled raw marijuana emanating from the edges of the door. He did not go anywhere else on the property before he

- 2 -

left to obtain a warrant. The affidavit attached to the warrant indicated that uniform patrol was on scene, but contained only the detective's observations.[2]

When the police executed the search warrant, Carlson refused to come out of the trailer and a lengthy standoff ensued. Eventually, a SWAT team made entry, and Carlson ran out the back of the trailer before ultimately being arrested.

Inside the trailer, law enforcement discovered a grow operation. The trailer was outfitted with ventilation, heat lamps, and other equipment necessary to grow marijuana. Officers found approximately 176 marijuana plants at various stages of growth and a garbage bag of marijuana apparently trimmed off of the plants. In the bathroom, officers discovered marijuana leaves in and around the toilet and an envelope full of cash in various denominations. Elsewhere in the trailer, officers discovered an AK-47, various boxes of ammunition, a digital scale, and a device used to smoke marijuana. Additionally, officers discovered a police scanner that was tuned to the same channel the police were using to communicate during the investigation, and the officers inside could hear radio communication from officers still outside.

Carlson filed a pretrial motion to suppress the evidence from the trailer arguing that the officers' initial entry onto his property was unlawful. Carlson did not challenge the warrant itself, rather he argued that Detective Cusumano's presence on the property was a direct result of the officers' unlawful search. At the suppression hearing, both Officers Elliot and Gosnell testified and openly admitted to sniffing around the windows and doors of the trailers, including

---

[2] The affidavit stated the following:

> I responded to the mobile home park located at 2710 Ike St Lot 65 Chesapeake, Va 23325. Uniform patrol was on scene and had a strong odor of marijuana present in the area. I walked up to Lot 65 and the smell of marijuana was emanating from the front door. I am requesting a search warrant from the mobile home lot 65 which is labeled with gold paint due the strong odor emanating from the front door.

Carlson's. Officer Elliot testified that that when they "got to 65" they could tell the marijuana odor was coming from that particular trailer. When asked if "got to 65" meant "sniffing the doors and windows" of trailer 65, Officer Elliot said yes. He also agreed that it was when they "walked up to the door" that they "were able to centralize the odor." Officer Gosnell testified that the marijuana smell got stronger as they walked towards trailer 65, "but [they] had still not centralized it to that trailer itself." Further, Gosnell testified it was "while in the curtilage of the property . . . it became increasingly strong," and only then were they "beginning to believe that this may be it." The trial court requested supplemental briefing on the issue.

Carlson argued that the search was unlawful and that the search pursuant to the warrant, based upon Detective Cusumano's observations, was not sufficiently attenuated from the unlawful search. Carlson also argued that Detective Cusumano was not an independent source. The Commonwealth responded that the officers' search was lawful, Detective Cusumano was an independent source, and, regardless, Carlson failed to challenge the warrant.

At a second hearing on the issue, the trial court determined the officers had "overstepped their boundary" and that the search was unlawful. After further argument on the independent source doctrine, the trial court determined it was a "close call" but overruled the motion because "[w]e did have a warrant." The trial court denied Carlson's motion to reconsider.

At trial, the Commonwealth's expert, Detective Barlow, testified that the amount of marijuana found was inconsistent with personal use. He estimated that the potential yield (under optimal conditions) was forty-four pounds of marijuana. Even if not all of the plants would bud or mature, Detective Barlow estimated a low yield street value of $20,000. He further testified that those involved in the drug trade often carry firearms to protect themselves from robbery.

Carlson moved to strike, arguing that the Commonwealth had not provided sufficient evidence that the marijuana was manufactured for distribution rather than his own personal use. The trial court denied the motion.

Carlson then testified on his own behalf. He testified that he used the marijuana for pain management of his sleep apnea and scoliosis and that he needed such a large quantity of plants because he was not sure how many would survive and produce buds. Further, he explained that the AK-47 was for personal protection, and the cash, which was found in a bank envelope, was used to pay his bills since, in his condition, he was unable to drive to his bank when necessary. He also testified that the digital scale was for his coin collection. After his testimony, Carlson renewed his motion to strike, which the trial court denied. Ultimately, Carlson was convicted and sentenced. Carlson timely noted his appeal to this Court.

## II. ANALYSIS

### A. Motion to Suppress

Carlson argues on appeal that the trial court erred in denying his motion to suppress evidence. He argues that the evidence obtained pursuant to the search warrant was tainted by the officers' initial unlawful entry onto the curtilage of his property.[3] We agree.

_____

[3] As an initial matter, we note the somewhat unusual posture of this case. Carlson did not challenge the warrant itself, nor did he challenge Detective Cusumano's entry onto the property prior to obtaining the warrant. In fact, Carlson conceded at oral argument that Detective Cusumano's entry was not a violation of the Fourth Amendment. Carlson argues only that Detective Cusumano's presence at the scene and his observations, and therefore the evidence obtained from them, are the fruit of the initial unlawful entry. In both Murray v. United States, 487 U.S. 533 (1988), and Segura v. United States, 468 U.S. 796 (1984), the defendants challenged the admissibility of evidence obtained in similar circumstances, where a search pursuant to a warrant followed an initial unlawful entry. Neither party challenged the warrant itself. Thus, Carlson was not required to specifically challenge the warrant. Rather, the question is whether the "search pursuant to the warrant was, in fact, a genuinely independent source of the information and tangible evidence at issue here." Murray, 487 U.S. at 542.

"On appeal of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth." McCracken v. Commonwealth, 39 Va. App. 254, 258 (2002). Our review includes "evidence adduced at both the trial and the suppression hearing." Greene v. Commonwealth, 17 Va. App. 606, 608 (1994). We give deference to the trial court's factual findings and review *de novo* the application of law to those facts. Murphy v. Commonwealth, 264 Va. 568, 573 (2002). Carlson has the burden to show that the denial of his suppression motion was reversible error. Commonwealth v. Robertson, 275 Va. 559, 564 (2008).

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. If, as here, the trial court determines a search was conducted in violation of the Fourth Amendment,[4] the evidence is subject to the exclusionary rule, which prohibits the introduction of evidence, tangible or testimonial, acquired during an unlawful search. Murray v. United States, 487 U.S. 533, 536 (1988). The exclusionary rule also prohibits "derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search." Id. at 536-37 (quoting Nardone

---

[4] On brief, the Commonwealth argues that the initial warrantless search was supported by probable cause and justified by exigent circumstances. The trial court, however, ruled against the Commonwealth and concluded that the initial search was unlawful. In the guise of a "right result for the wrong reason" argument, the Attorney General is, in effect, asking this Court to reverse this decision of the trial court. See Hart v. Commonwealth, 221 Va. 283, 290 (1980).

But the "constitutional and statutory authority for Commonwealth appeals is narrowly circumscribed." Commonwealth v. Brown, 8 Va. App. 41, 43 (1989). The Commonwealth may only appeal a ruling of the trial court in those instances specifically permitted by the state constitution or state statute. Va. Const. art. VI, § 1; Code § 19.2-398. An appeal of a pretrial suppression ruling after the conviction of a defendant is not one of the narrow grounds of appeal allowed to the Commonwealth. See Code § 19.2-398. "We will not in this appeal permit the Commonwealth to accomplish indirectly what it cannot do directly . . . ." Hart, 221 Va. at 290 (relying on a prior version of Va. Const. art. VI, § 1 to prohibit the Commonwealth from indirectly appealing a pretrial ruling after a conviction where no right of appeal existed). Because there is no statutory authority for appealing this issue, we do not consider the Commonwealth's argument that the initial warrantless search was lawful and we are bound by the trial court's finding that the search was unlawful. Accordingly, the only issue before this Court is that appealed by Carlson, the trial court's ruling on the admissibility of the evidence under an exception to the exclusionary rule.

v. United States, 308 U.S. 338, 341 (1939)).  The "prohibition of derivative evidence is the essence of the 'fruit of the poisonous tree' doctrine."  Commonwealth v. Ealy, 12 Va. App. 744, 754 (1991).

Nevertheless, "simply because [evidence] would not have come to light but for the illegal actions of the police" does not mean that the evidence is automatically excluded.  Fitchett v. Commonwealth, 56 Va. App. 741, 746 (2010) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)); see also Hudson v. Michigan, 547 U.S. 586, 591 (2006) (observing "but-for-causality is only a necessary, not a sufficient, condition for suppression").  Exclusion of evidence is a last resort rather than the first impulse.  Hudson, 547 U.S. at 591.  The purpose of the exclusionary rule is to deter police misconduct, and where that purpose is not met, exclusion generally is not justified.  Johnson v. Commonwealth, 21 Va. App. 172, 175 (1995).

The question in cases such as this, is whether the evidence, both direct and indirect, obtained subsequent to the unlawful entry was "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint."  Ealy, 12 Va. App. at 755 (alteration in original).  Evidence is sufficiently distinguishable from the initial illegality if:  (1) the evidence can be attributed to an independent source, (2) the connection between the evidence and the illegality has become so attenuated as to dissipate the taint, or (3) the evidence inevitably would have been gained without the unlawful action.  Warlick v. Commonwealth, 215 Va. 263, 266 (1974); see also Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016).

### 1. *Independent Source Doctrine*

After extensive argument on whether Detective Cusumano qualified as an independent source, the trial court noted that it was a close call, but denied the motion to suppress.  Carlson argues that Detective Cusumano is not an independent source because his presence on the scene

is a direct result of the officers' unlawful entry.[5]  We agree there was no independent source for the evidence obtained pursuant to the warrant.

The independent source doctrine works to put the Commonwealth in the same position it would have been in if there was no police error or misconduct.  Nix v. Williams, 467 U.S. 431, 443 (1984).  Thus, the "independent source doctrine allows the admission of evidence that has been discovered by means wholly independent of any constitutional violation."  Id.  If such an independent source exists, exclusion of the evidence would put the Commonwealth in a worse position than if there had been no error or misconduct.  Id.

In Murray, the Supreme Court determined the independent source doctrine applied to a case where an illegal search preceded a search pursuant to a warrant.  487 U.S. 533.  Federal agents, acting on an informant's tip, observed vehicles enter a warehouse.  When the vehicles came out, the agents lawfully seized both vehicles and discovered they were loaded with marijuana.  Id.  Several agents then entered the warehouse without a warrant.  When the agents eventually applied for a warrant, they did not mention the unlawful entry or any observations made during that entry.  Id. at 536.  The Supreme Court held that if a lawful seizure is genuinely independent from an earlier tainted one, then the independent source doctrine applies.  Id. at 542.  But the subsequent search is not genuinely independent if the "agents' decision to seek the warrant was prompted by what they had seen during the initial entry."  Id.[6]  "[W]hat counts is whether the actual illegal search had any effect in producing the warrant . . . ."  Id. at 542 n.3.

---

[5] The Commonwealth did not address this issue on brief, though it did address the issue during oral argument.

[6] The Murray Court also noted that the illegal conduct must not affect the magistrate's decision to issue the warrant.  487 U.S. at 542.  That is not an issue here because, as noted above, Carlson does not challenge the warrant or Detective Cusumano's observations.

In Segura v. United States, 468 U.S. 796 (1984), police obtained information that Segura was selling cocaine. Because of the late hour, police were unable to obtain a search warrant until the following day. Id. at 800. Rather than wait, the agents entered Segura's apartment and discovered drug paraphernalia in plain view. Id. at 800-01. The agents later executed the warrant and discovered significant additional evidence. The Supreme Court reasoned that "[n]one of the information on which the warrant was secured was derived of or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known by agents well before the initial entry." Id. at 814. Because the illegal entry "did not contribute in any way to discovery of the evidence seized under the warrant," the evidence was admissible. Id. at 815.

Applying the principles from Murray and Segura, we conclude that the unlawful entry did prompt the subsequent presence of and investigation by Detective Cusumano. In Murray and Segura, the agents obtained their information through informants and surveillance, which they obtained prior to the unlawful entry. Murray and Segura were already the targets of the investigations. Here, the information supporting probable cause was not obtained prior to the initial unlawful entry. Without the unlawful entry, the officers had no evidence connecting the marijuana odor to Carlson or his residence, nor was Carlson a subject of any investigation. It was only through the unlawful actions of the officers—both the entry onto Carlson's property and the property of the other trailer owners—that the officers were able to connect the odor to a particular location. See Jones v. Commonwealth, 277 Va. 171, 178 (2009) (noting that a finding of probable cause requires a "fair probability that contraband or evidence of a crime will be found in a *particular place*" (emphasis added) (quoting United States v. Grubbs, 547 U.S. 90, 95 (2006))).

Although Detective Cusumano went to the scene and made his own observations, he was present at the scene, at this particular trailer, solely because he was called there by the officers who conducted the unlawful search and told him they smelled marijuana. Thus, the unlawful search contributed directly to his presence at the scene, and his observations in the affidavit were not "wholly unconnected" to the unlawful entry. Moreover, because of the direct connection between the illegal search and the presence of Detective Cusumano, it cannot be said that the illegal search had no effect in producing the warrant.

## 2. *Attenuation Doctrine*

Carlson also argues that nothing occurred to remove the taint of the original illegality. We agree.

Under the attenuation doctrine, "evidence is admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." Strieff, 136 S. Ct. at 2061. Courts look to whether there is a temporal proximity between the unconstitutional conduct and the discovery of evidence, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct. Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

The officers' vital role in summoning Detective Cusumano weighs against a determination that his separate observations dissipated the taint of the initial unlawful entry. The detective testified he knew nothing about the trailer or the investigation until the officers called and informed him of their observations. Both officers testified that they called Vice and Narcotics almost immediately after their unlawful entry, and the detective arrived approximately one hour later. He walked immediately to the correct trailer. He was only able to do so because, as the trial court determined, the officers had violated the curtilage of each residence in the area

- 10 -

to localize the smell to a particular location. Thus, the record does not support a finding that the discovery of the evidence was attenuated from the unlawful search.

### 3. *Inevitable Discovery*

The Commonwealth argues that the officers would have ultimately discovered the evidence by lawful means and thus the evidence is admissible under the inevitable discovery doctrine. Because the record does not support that conclusion, we disagree.

The inevitable discovery doctrine is an "off-shoot of the independent source doctrine," Wilkins v. Commonwealth, 37 Va. App. 465, 475 (2002), and is likewise intended to put police in the same position they would have been without the error or misconduct. Under this exception to the exclusionary rule, evidence obtained by unlawful means is admissible if that evidence or information "ultimately or inevitably would have been discovered by lawful means." Commonwealth v. Jones, 267 Va. 532, 536 (2004) (quoting Nix, 467 U.S. at 444). To establish this, the Commonwealth must show "(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct" and "(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct." Id. (citation omitted).

In Nix, officers called off a body recovery search after the suspect directed the officers to the location of the body. 467 U.S. at 449. That information, however, was obtained in violation of the defendant's constitutional right to counsel. Id. at 437. Nonetheless, the body's discovery and the evidence obtained therefrom were admissible because the government had demonstrated that the body would have been discovered by the search party if the search had not been called off. Id. at 449-50. The agent in charge of the search testified about the grid patterns used, the parameters of the search, the division of the volunteers, and the direction the search was moving. Id. Thus, the Court held that the deterrence purpose of the exclusionary rule was not met, and

exclusion would put the government in a worse position than if there had been no misconduct. Id. at 447.

Here, there is no dispute that the officers smelled an overwhelming odor of marijuana and that they would have investigated the source of the odor. Unlike the record in Nix, however, the record contains no evidence about how the evidence would otherwise have been lawfully obtained had the officers not conducted their unlawful search of Carlson's premises, or that of the other residences. While the officers' testimony indicated that they walked around and attempted to localize the source of the marijuana smell, it also demonstrates that the officers were only able to do so by repeatedly violating the curtilage of the surrounding trailers.[7] While the officers almost certainly would have continued their investigation, we can only speculate as to how they would have lawfully localized the source of the smell to Carlson's trailer.[8] And "inevitable discovery involves no speculative elements but focuses on demonstrated historical

---

[7] The Commonwealth also argues that the police conduct was not "sufficiently deliberate" or "sufficiently culpable" that exclusion can deter the conduct and justify the price paid by the justice system. The Commonwealth contends that the officers, after narrowing down the possible source of the odor, "went one step too far in confirming their belief by sniffing the trailer's window casings and doorjamb." This is inconsistent with the testimony of the officers, who admitted to sniffing the windows and doors of all the nearby trailers in an attempt to narrow down the source of the smell. Thus, the misconduct was not limited to Carlson's property.

We recognize "that Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). Nonetheless, the other unlawful searches demonstrate that the police conduct was sufficiently culpable to justify application of the exclusionary rule. See Davis v. Commonwealth, 564 U.S. 229, 239 (2011) (noting "recurring or systemic negligence" on the part of law enforcement can influence application of the exclusionary rule). Moreover, the other unlawful searches are relevant to whether there was a reasonable probability the police would have inevitably discovered the evidence through "lawful means." See Jones, 267 Va. at 536.

[8] The Commonwealth argues that they were not required to prove with certainty that Carlson's trailer was the source of the marijuana odor to prove probable cause. Nonetheless, the Commonwealth was required to demonstrate a "fair probability that contraband or evidence of a crime will be found in a *particular place*." Jones, 277 Va. at 178 (emphasis added) (quoting Grubbs, 547 U.S. at 95). Without the unlawful conduct, it is uncertain whether the officers would have been able to do so.

facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Id. at 444 n.5. Thus, we cannot say the evidence would have ultimately or inevitably been obtained without police misconduct.

## B. Sufficiency of the Evidence

In his second assignment of error, Carlson argues that the evidence was insufficient to prove that the marijuana was intended for distribution rather than for personal use. Because we remand on a motion to suppress, and the Commonwealth may elect to retry the defendant without the suppressed evidence, we must address Carlson's claim that the Commonwealth's evidence was insufficient. "If the evidence adduced at trial was insufficient to convict [Carlson], he is entitled to an acquittal; if he is so entitled, a remand for retrial would violate the Constitution's prohibition against double jeopardy." Parsons v. Commonwealth, 32 Va. App. 576, 581 (2000); see also Timbers v. Commonwealth, 28 Va. App. 187 (1998) (addressing sufficiency after reversing on a Miranda violation). If the evidence was sufficient, then the Commonwealth, if it so chooses, is free to retry Carlson on remand.

"When reviewing the sufficiency of the evidence to support a conviction, the Court will affirm the judgment unless the judgment is plainly wrong or without evidence to support it." Bolden v. Commonwealth, 275 Va. 144, 148 (2008). The Court considers the evidence in the light most favorable to the Commonwealth, as the prevailing party below. Farhoumand v. Commonwealth, 288 Va. 338, 351 (2014). Additionally, "we must consider all the evidence admitted at trial, including evidence admitted erroneously." Wells v. Commonwealth, 65 Va. App. 722, 726 (2016).

Code § 18.2-248.1 prohibits the manufacture of marijuana "not for [one's] own use." Carlson does not dispute that he manufactured the marijuana, but argues that he did so for his own use. Because it is frequently not possible to prove intent with direct evidence, it may be

proven by circumstantial evidence. <u>Scott v. Commonwealth</u>, 55 Va. App. 166, 172 (2009). Factors that may suggest the drugs were not intended for personal use include the possession of a quantity of drugs greater than that ordinarily possessed for one's personal use, the quantity and denomination of cash possessed, the presence of equipment related to drug distribution, and the presence of firearms. <u>Emerson v. Commonwealth</u>, 43 Va. App. 263, 278 (2004).

Carlson possessed a large quantity of marijuana plants—more than 150. He had a large amount of cash in various denominations, a digital scale, an AK-47, and extra ammunition. In addition, police discovered a surveillance camera and a police scanner. Despite Carlson's explanations for each piece of evidence, a fact-finder is entitled to weigh the credibility of witnesses, <u>Blow v. Commonwealth</u>, 52 Va. App. 533, 538 (2008), and the fact-finder here chose not to credit Carlson's explanations. The evidence presented at trial was sufficient and, therefore, a second trial would not violate double jeopardy.

### III. CONCLUSION

For the foregoing reasons, we reverse the ruling of the trial court, vacate the defendant's convictions, and remand for the Commonwealth to determine whether it has sufficient evidence to retry Carlson after suppression.

<u>Reversed, vacated and remanded.</u>