COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Malveaux and Causey
Argued by videoconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.        Record No. 1054-22-2                    JUDGE MARY BENNETT MALVEAUX
                                                  DECEMBER 29, 2022

RICHARD HENDRICK, S/K/A
  RICHARD ALVIN HENDRICK


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellant.

Kelsey Bulger, Senior Appellate Attorney (Virginia Indigent Defense
Commission, on brief), for appellee.


Richard Alvin Hendrick was indicted for two counts of possession of a controlled

substance with intent to distribute, in violation of Code § 18.2-248(C).  He filed a pretrial motion

to suppress the drug evidence, which he alleged was discovered during an unlawful search of his

car.  Following a hearing, the trial court granted the motion and suppressed the evidence.

Pursuant to Code §§ 19.2-398(A)(2) and -400, the Commonwealth appeals the court's pretrial

ruling.  The Commonwealth contends that the drugs' discovery did not violate the Fourth

Amendment because they were found during a protective sweep based upon a reasonable,

articulable suspicion that Hendrick was dangerous and might access his car to gain control of a

weapon.  In the alternative, the Commonwealth argues that even if officers initially lacked

reasonable, articulable suspicion, their discovery of the drugs was attenuated from their initial

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

actions by Hendrick's later statement about a firearms charge, which provided a basis for a protective sweep. For the following reasons, we affirm the trial court's ruling.

## I. BACKGROUND

In an appeal by the Commonwealth of a trial court order suppressing evidence, "the evidence must be viewed in the light most favorable to the defendant," the party who prevailed below. *Commonwealth v. Peterson*, 15 Va. App. 486, 487 (1992). We also "grant all reasonable inferences fairly deducible from that evidence" to the defendant. *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991).

Shortly before midnight on November 3, 2021, Officers Danko and Gomes of the Richmond Police Department saw Hendrick turn left after he failed to fully stop at a stop sign. Danko turned on his lights and siren, and the officers stopped Hendrick's car. Officer Burgess, who was driving nearby, arrived to assist as the traffic stop began. All three officers testified at the suppression hearing that the stop occurred in a neighborhood they consider a high-crime area, although Danko and Gomes stated that at the time of the stop, they were not investigating any active service call in the area.

Burgess parked where he had a "good view of [Hendrick's] driver's side door." He stated that as he "pulled up," he could see Hendrick "[h]unched over" and "leaning towards the steering wheel, going toward the floorboard . . . and then he looked back . . . in the mirror." Burgess testified that based upon his training and experience, Hendrick's movements indicated "somebody . . . trying to conceal something," and he was "[c]oncerned it[ ] [was] a weapon." Gomes also testified that as he was getting out of Danko's car, he saw Hendrick "make a movement towards the steering wheel . . . his hands were down toward the floorboard." Danko, approaching Hendrick's car from the driver's side, heard Burgess say that he "saw [Hendrick] reaching under the seat."

Danko walked up to the driver's side window, where Hendrick, the car's sole occupant, was visible sitting upright with his hands in view.[1]  After greeting Hendrick, Danko immediately requested that he step out of the car; he also asked Hendrick if he had any weapons in the car. Hendrick answered, "[n]o, sir," and stepped out.  Danko handcuffed Hendrick and asked him if he had any weapons "on [him]."  Hendrick replied that he did not.  Danko and Burgess conducted a pat-down search of Hendrick, based upon their location in a high-crime area and Burgess' statement that Hendrick had been "reaching under the seat."  Danko testified that such "furtive movements . . . normally indicate that someone is trying to either stash a firearm or a weapon" and that "at that point, I thought that Mr. Hendrick might be armed."  Danko also stated that the only reason he asked Hendrick to get out of his car during the traffic stop was because of Burgess' statement and that Hendrick had been polite and cooperative throughout the stop.  Burgess and Danko did not find any weapons on Hendrick.

As soon as Hendrick was handcuffed, Gomes "started to conduct a protective sweep of the vehicle," beginning with the driver's compartment.  Hendrick, who was standing with Danko and Burgess at the rear of his car following the pat down, told the two officers that the mother of his child lived nearby.  When Burgess asked him, "[w]hat were you just reaching around for in the front seat?", Hendrick replied that he had been "fixing [his] boot."  He then told the officers that he had "just c[o]me home" from "a gun charge."

After hearing Hendrick's "gun charge" statement, Burgess stepped over to Hendrick's car and opened the front passenger's door to speak with Gomes; at that point, Gomes had been looking through the driver's compartment for just over one minute.  Burgess told Gomes that Hendrick had "sa[id] he just came home from a gun charge, felon with a firearm . . . charge."  Gomes testified that

---

[1] Body camera footage from each of the three officers was introduced into evidence at the suppression hearing and is part of the basis of this factual recitation.

after hearing this, he continued his protective sweep of the driver's compartment before moving to search the back seat area.

Burgess testified that after informing Gomes about Hendrick's statement, he joined in the protective sweep. He first examined the front passenger compartment of Hendrick's car before moving to the back seat area. During this time, Burgess and Gomes discussed Hendrick's movement. Burgess told Gomes, "[d]ude, he was divin' in the front, so I don't know if he shoved some shit down his pants," and "[h]e definitely was in the front. He had something down his pants, I think." He also stated, "[i]f I was a betting man, he put it down his nuts."

About a minute after joining Gomes, Burgess moved to the driver's compartment. Seconds later, a police dispatcher, who had checked Hendrick's record after officers provided her with his name and Social Security number, radioed the officers that her check was "showing a probably armed." Thirty seconds after the dispatcher imparted this information, Burgess announced to Gomes, "[o]h, there you go. There's all the drugs right there."

Burgess testified that in "a little gap" that was "[u]nder the steering column," he could see "a knotted . . . baggie sticking out." The baggie appeared to contain a white substance. Subsequent analysis by the Virginia Department of Forensic Science determined that the baggie's contents comprised cocaine and a mix of heroin and fentanyl. Burgess stated that the gap where he found the baggie was in the area where he had seen Hendrick reaching. He also stated that the gap was sufficient to accommodate a knife or a "small Glock, definitely a Derringer."

During cross-examination, Burgess acknowledged that during Hendrick's pat down, he had specifically checked his groin and "didn't feel any weapon." He also stated that "[if] there was a weapon in [Hendrick's] pants, yes, I'm pretty confident I would have felt it." Burgess also testified that Hendrick had large sums of money on him. He acknowledged that Hendrick had simply told him that he had a "gun charge," and "didn't tell me what gun charge it was" or whether it

- 4 -

constituted a felony or a misdemeanor; rather, Burgess had "assume[d] it's a felony gun charge." After Burgess found the baggie under the steering column, he "didn't continue to search the [driver's] compartment."

Hendrick filed a motion to suppress and, following a hearing, the trial court entered an order granting the motion. The court found that Hendrick

> was driving through a high crime area at 11:55 p.m. He was pulled over for . . . a traffic infraction. When the officers pulled [him] over . . . , they did not know the identity of the driver. The officers were not responding to [a] call or actively investigating criminal activity. They were simply patrolling the area and witnessed a traffic infraction. As they approached the vehicle, Officer Burgess called out that he saw [Hendrick] making what he classified as a "furtive movement"—leaning over the steering wheel and reaching toward the floorboard. When Officer Danko approached the driver's side window, [Hendrick] had his hands on the steering wheel and was sitting upright. He did not appear nervous and he made no further "furtive movements."

Based upon these circumstances, the court held that the officers lacked reasonable, articulable suspicion to conduct a protective sweep of Hendrick's car. The court also rejected the Commonwealth's argument, based upon the attenuation doctrine, that Hendrick's subsequent statement about just coming home from a gun charge provided a reasonable, articulable suspicion supporting a sweep. The court found that at the time Hendrick made his "gun charge" statement "the officers had already moved from a sweep to a search," and held that the attenuation doctrine was not applicable.

This appeal followed.

## II. ANALYSIS

On appeal of an order granting a defendant's motion to suppress, the Commonwealth has the burden to show that the ruling constituted reversible error. *See Murphy v. Commonwealth*, 264 Va. 568, 573 (2002). Upon review of the ruling, the appellate court is bound by the trial court's factual findings "unless they are plainly wrong or without evidence to support them."

*Peterson*, 15 Va. App. at 487. *See also* Code § 8.01-680. "In addition, we 'give "due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."'" *White v. Commonwealth*, 73 Va. App. 535, 552 (2021) (quoting *Kyer v. Commonwealth*, 45 Va. App. 473, 479 (2005) (*en banc*)). Ultimately, however, "we 'review[] *de novo* the overarching question'" of whether police conduct violated the Fourth Amendment. *Id.* (alteration in original) (quoting *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021)). "Specifically, 'determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.'" *Freeman v. Commonwealth*, 65 Va. App. 407, 415 (2015) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). "Whether the Fourth Amendment has been violated is a question to be determined from all the circumstances," and "[r]eview of the existence of probable cause or reasonable suspicion involves application of an objective rather than a subjective standard." *McCain v. Commonwealth*, 275 Va. 546, 552 (2008).

## A. The Protective Sweep

The Commonwealth argues that as the officers approached Hendrick, they possessed reasonable, articulable suspicion that he was dangerous and might access his car to gain immediate control of a weapon; thus, a protective sweep for weapons was justified. Accordingly, the Commonwealth contends, the trial court erred in granting Hendrick's motion to suppress the drugs that were incidentally discovered during the sweep.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *White*, 73 Va. App. at 552 (alteration in original) (quoting U.S. Const. amend. IV). "[B]y its express terms," the amendment "protects not only the individual, but also his or her things, and, most pertinent here, his or her [car] from unreasonable searches." *Id.* (first alteration in original) (quoting *Saal v. Commonwealth*, 72 Va. App. 413, 421 (2020)).

- 6 -

In *Terry v. Ohio*, 392 U.S. 1 (1968), "the United States Supreme Court permitted 'a protective search for weapons in the absence of probable cause to arrest . . . when a [police officer] possesses an articulable suspicion that an individual is armed and dangerous.'" *McArthur v. Commonwealth*, 72 Va. App. 352, 359 (2020) (alterations in original) (quoting *Michigan v. Long*, 463 U.S. 1032, 1034 (1983)). Subsequently, "[r]ecognizing the inordinate risk confronting the officer as he approaches a person seated in an automobile, the Court has extended such protective searches beyond the person, including areas of the passenger compartment of an automobile in which a weapon may be placed or hidden." *Id.* (quoting *Long*, 463 U.S. at 1034). *See also Maryland v. Buie*, 494 U.S. 325, 332 (1990) (noting that "[i]n a sense, *Long* authorized a 'frisk' of an automobile for weapons"). "The 'sole justification' for both types of limited searches for weapons is 'the protection of police officers and others nearby,'" and such searches are only permissible where an officer "'possesses a reasonable belief based on "specific and articulable facts [that] . . . reasonably warrant" [an] officer in believing [a] suspect is dangerous and . . . may gain immediate control of weapons.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (alterations in original) (first quoting *Long*, 463 U.S. at 1049 n.14; then quoting *Stanley v. Commonwealth*, 16 Va. App. 873, 875 (1993)).

When analyzing whether an officer has a reasonable basis to believe a person is dangerous and might gain immediate control of a weapon in his car, a number of circumstances are relevant. These include "the time of the stop, the specific conduct of the suspect[ed] individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *Id.* at 16 (alteration in original) (quoting *McCain*, 275 Va. at 554). The determinative question is not "whether each individual factor, viewed alone, 'is susceptible [to an] innocent explanation' but, rather, whether the various factors, '[t]*aken together*,' are sufficient to 'form a particularized and objective basis' for an

officer's suspicion." *Id.* (alterations in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). This standard only requires "proof of . . . a reasonable belief that the suspect *might* have a weapon and gain control of it. 'The degree of certitude required by the reasonable suspicion standard "is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less demanding than that for probable cause."'" *Id.* (quoting *Morris v. City of Va. Beach*, 58 Va. App. 173, 183 (2011)). Ultimately, "[t]he authority to conduct a [protective sweep] does not follow automatically from the authority to effectuate an investigative stop. 'Only where the officer can "point to particular facts from which [the officer] reasonably inferred that the individual was . . . dangerous"'" and might gain access to weapons is he justified in searching for weapons. *Lowe v. Commonwealth*, 33 Va. App. 656, 661 (2000) (third alteration in original) (citation omitted) (quoting *Williams v. Commonwealth*, 4 Va. App. 53, 66-67 (1987)).

Here, the trial court found that the officers lacked reasonable, articulable suspicion to support a protective sweep. In reaching this conclusion, the court made a number of factual determinations about the circumstances of Hendrick's encounter with police. Specifically, the court found that Hendrick was driving in a high-crime area at nearly midnight, he was stopped for a traffic infraction by officers who did not know his identity, and who were not responding to a call or otherwise actively investigating criminal activity, as officers approached, he was seen to engage in what police considered a "furtive movement"—leaning over the steering wheel and reaching toward the floorboard, he was sitting upright with his hands visible when Danko reached his window, and he did not exhibit nervousness or make additional "furtive movements" once Danko approached. These factual findings by the trial court are supported by the record evidence and are not plainly wrong. Accordingly, they bind the Court and establish parameters

- 8 -

for our *de novo* review of the trial court's legal conclusion that the officers lacked a reasonable, articulable suspicion to justify a protective sweep.[2] *See Peterson*, 15 Va. App. at 487.

The Commonwealth contends that based on these facts, the officers possessed an objectively reasonable and articulable suspicion "to conduct a protective sweep of [Hendrick's] vehicle which led to officers locating illegal narcotics in the passenger [sic] compartment." Specifically, it focuses on the fact that the traffic stop occurred late at night in a high crime area and that after the officers had identified themselves as police by activating their lights and a siren, they observed Hendrick make a "furtive movement." Based upon the officers' training and experience, the Commonwealth argues, they were justified in interpreting these facts to reasonably suspect that Hendrick possessed a weapon, sought to conceal it, and, "if allowed back into his vehicle, [would] pose[] a threat to their safety."

We are unconvinced by the Commonwealth's argument and conclude, based upon a consideration of all the facts and circumstances surrounding the traffic stop, that the trial court did not err in finding that the officers lacked reasonable, articulable suspicion for a protective sweep. Although the stop occurred late at night in a high-crime area, it is well-established that such circumstances are not themselves determinative of the issue of reasonable, particularized suspicion. *See, e.g.*, *Whitaker v. Commonwealth*, 279 Va. 268, 276 (2010) ("[W]hile a suspect's presence in a high crime area, standing alone, is not enough to support a reasonable articulable suspicion, it is a relevant contextual consideration in a *Terry* analysis."); *McArthur*, 72 Va. App. at 361 ("Even though this traffic stop did occur in a 'high crime area,' the Virginia Supreme Court has held that a 'person's Fourth Amendment rights are not lessened simply because he or she happens to live or travel in a 'high crime' area.'" (quoting *McCain*, 275 Va. at 553)). Hendrick made a single movement over the steering wheel and toward the floorboard as officers

_____

[2] The Commonwealth does not challenge these factual findings by the trial court.

approached his car, but he had ceased his movement and was sitting upright with his hands in plain view when officers stepped up to his window. Further, he exhibited no signs of nervousness, such as shaking hands, heavy breathing, or sweating. *See, e.g.*, *Curley v. Commonwealth*, 295 Va. 616, 619 (2018) (holding that protective sweep was justified, in part, by the defendant's shaking hand and heavy breathing); *Walker v. Commonwealth*, 42 Va. App. 782, 791 (2004) (same, where the defendant was breathing heavily and "very nervous"); *Glover v. Commonwealth*, 3 Va. App. 152, 157 (1986) (same, where the defendant was "sweating heavily" and "appeared nervous and preoccupied"). Hendrick was polite to the officers and complied with their request when they asked him to step out of his car, and he offered them plausible reasons for his presence in the area and his movement within his car. Additionally, the police were not investigating any reported crime in the area and did not know Hendrick's identity when they witnessed him make a left turn without fully stopping at a stop sign and decided to pull him over. Taken together, these facts and circumstances do not indicate that when the officers stopped Hendrick, they possessed anything more than a mere "hunch" that he might be dangerous and have a weapon in his vehicle that he could use to threaten their safety.[3] Accordingly, we conclude that the trial court did not err in finding that the officers lacked reasonable, articulable suspicion to justify a protective sweep of Hendrick's vehicle when they first encountered him during a traffic stop.[4]

---

[3] Even if the officers subjectively suspected Hendrick of involvement with illicit drugs, the Commonwealth presented no evidence to support an objective basis for such suspicion. *See, e.g.*, *Hilliard v. Commonwealth*, 17 Va. App. 23, 26 (1993) (noting that "[s]uspicion of illegal drug possession and distribution is a circumstance which gives rise to an inference of dangerousness" supporting a protective sweep). The evidence indicates only that Hendrick committed a late-night traffic infraction in a neighborhood officers considered "high-crime."

[4] The trial court, in holding that the officers lacked reasonable, articulable suspicion to justify a sweep, relied upon several decisions of this Court. In particular, it relied upon language in *Hill v. Commonwealth*, 68 Va. App. 610 (2018), *aff'd*, 297 Va. 804 (2019), for the proposition that "[t]he Court of Appeals has recognized that a single furtive movement in a high crime area a

B.  The Attenuation Doctrine

In the alternative, the Commonwealth argues that Hendrick's statement about a "gun charge" provided the officers with a reasonable, articulable suspicion justifying a "subsequent or continued protective sweep" and "attenuated the finding of the [narcotics] from the original sweep."  Accordingly, the Commonwealth contends, the trial court erred in finding that the attenuation doctrine did not apply and granting Hendrick's motion to suppress.

"Under the attenuation doctrine, 'evidence is admissible when the connection between . . . unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance.'"  *Carlson v. Commonwealth*, 69 Va. App. 749, 762 (2019) (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)).  In applying the doctrine, "[c]ourts look to whether there is a temporal proximity between the unconstitutional conduct and the discovery of

---

is insufficient to justify a *Terry* stop."  Our resolution of *Hill* was based in part upon an analysis of two additional cases which the trial court also relied upon:  *Smith v. Commonwealth*, 12 Va. App. 1100 (1991), and *Riley v. Commonwealth*, 13 Va. App. 494 (1992).  Both cases involved defendants who were on foot in high-crime areas when they were seen making hand movements toward the front of their pants.  *Smith*, 12 Va. App. at 1102; *Riley*, 13 Va. App. at 496-97.  In one part of our opinion in *Hill*, we stated that "[u]nlike the defendants in *Smith* and *Riley*, [the] appellant did not merely exhibit a single furtive movement in a high crime area," a statement which the trial court quoted to support its reasoning that this case is "akin to *Riley* and *Smith*."  *Hill*, 68 Va. App. at 622.  But elsewhere in *Hill*, hewing more closely to the facts and reasoning of *Smith* and *Riley*, we were more careful in stating that "[w]e have held that a defendant's furtive *hand* gesture in a public place known for [criminal] activity is a circumstance which, in and of itself, is insufficient to justify a *Terry* stop."  *Id*. at 621 (emphasis added).

We take no position here on whether a single furtive hand gesture made outdoors in plain view of an officer, as in *Smith* and *Riley*, may be distinguishable from a "furtive movement" made inside an automobile compartment, where officers may be less able to see what an individual is doing or may have in his hands; thus we take no position on whether, as implied by the trial court, a single furtive movement of any kind, even in a high-crime area, is an insufficient basis for reasonable, articulable suspicion.  However, we note that a recent decision of this Court, *McArthur v. Commonwealth*, 72 Va. App. 352 (2020), suggests that this may be a distinction with a difference.  *See id*. at 362-63 (holding that protective sweep of a vehicle stopped in a high crime area for a defective fog light was unjustified, when the defendant was polite and cooperative during the stop, immediately exited the vehicle upon request, and "made *no furtive movements around the cabin of the vehicle* . . . . Without any further articulable facts indicating that [the officer] reasonably suspected that [the defendant] was armed and dangerous, it was unreasonable for the officer to conduct a protective sweep." (emphasis added)).

evidence, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *Id.* A "'finding with respect to attenuation . . . can only be made after consideration of all the circumstances of the case.' This necessarily requires a 'careful sifting of the unique facts and circumstances of each case.'" *Kyer*, 45 Va. App. at 483 (alteration in original) (citation omitted) (first quoting *United States v. Wellins*, 654 F.2d 550, 554 (9th Cir. 1981); then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)). Ultimately, the question is whether the evidence obtained was "come at by exploitation of [the initial] illegality or instead by a means *sufficiently distinguishable* to be purged of the primary taint." *Carlson*, 69 Va. App. at 759 (alteration in original) (quoting *Commonwealth v. Ealy*, 12 Va. App. 744, 755 (1991)).

The Commonwealth argues that Hendrick's statement that he had just returned home from a firearms charge "should have been considered an intervening circumstance that attenuated the finding of the contraband from any illegal conduct that occurred prior to [Hendrick's] statement." It contends that in the context of a traffic stop, an officer's knowledge about the recent criminal history of a driver or passenger, especially when that history involves weapons, is highly relevant and should be given due weight in determining whether there was reasonable, articulable suspicion to conduct a protective sweep. Accordingly, the Commonwealth argues, the trial court "improperly analyzed [Hendrick's] statement" and "erred when concluding that [his] statement was not an intervening event that caused the recovery of the contraband to be attenuated from the original sweep of the vehicle."

For purposes of this appeal, we assume, without deciding, that Hendrick's "gun charge" statement was sufficient to provide officers with reasonable, articulable suspicion for a protective sweep. But even making that assumption, we conclude that the trial court did not err in granting Hendrick's motion to suppress because the officers exceeded the permissible scope of such a

- 12 -

sweep. *See Ali v. Commonwealth*, 75 Va. App. 16, 37 n.9 (2022) (noting that "[t]he mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of th[e] goal" of "decid[ing] cases on the best and narrowest ground"); *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("The 'best' answer to a legal question is the one with which the least number of jurists would disagree or . . . the greatest number of jurists would agree. The 'narrowest' answer to a legal question is the one affecting the least number of cases.").

As noted above, *Terry* and its progeny "permit[] 'a protective search *for weapons* in the absence of probable cause to arrest . . . when a [police officer] possesses an articulable suspicion that an individual is armed and dangerous.'" *McArthur*, 72 Va. App. at 359 (second and third alterations in original) (emphasis added) (quoting *Long*, 463 U.S. at 1034). "The 'sole justification'" for such a "*limited search*[] *for weapons* is 'the protection of police officers and others nearby,'" where an officer possesses a reasonable, articulable suspicion that "'[a] suspect is dangerous and . . . may gain immediate control of weapons.'" *Bagley*, 73 Va. App. at 13 (second and third alterations in original) (emphasis added) (first quoting *Long*, 463 U.S. at 1049 n.14; then quoting *Stanley*, 16 Va. App. at 875). *See also Buie*, 494 U.S. at 332 (noting that "[i]n a sense, *Long* authorized a 'frisk' of an automobile *for weapons*" (emphasis added)). Accordingly, officers conducting a protective sweep must limit the sweep to a search for weapons that a suspect might gain immediate control over, thus presenting a threat to officers and others. Here, the record demonstrates that officers did not confine themselves to such a limited, permissible search for weapons; instead, they expanded their conduct to search for drugs.

Burgess testified that during the pat down of Hendrick, he checked Hendrick's groin and "didn't feel any weapon." He also testified that "[if] there was a weapon in [Hendrick's] pants, yes,

I'm pretty confident I would have felt it." Thus, by Burgess' own admission, prior to learning about Hendrick's "gun charge," he had ruled out the possibility that Hendrick had a weapon concealed down the front of his pants. However, after Burgess informed Gomes of Hendrick's statement and he joined Gomes in examining the interior of the car, Burgess discussed Hendrick's movement with Gomes. Burgess stated that Hendrick had been "divin' in the front, so I don't know if he shoved some shit down his pants" and that Hendrick "definitely was in the front. He had something down his pants, I think." Burgess also told Gomes, "[i]f I was a betting man, he put it down his nuts." Given that Burgess had already excluded that Hendrick had a weapon concealed down the front of his pants, the reasonable inference to be drawn from these statements, in context, is that the "it" or "shit" Burgess was concerned to search for and find was drugs he suspected Hendrick possessed. *See Grimstead*, 12 Va. App. at 1067 (providing that on appeal, "all reasonable inferences fairly deducible from th[e] evidence" are granted to a defendant who prevailed on a motion to suppress). This inference is further supported by Burgess' statement when, shortly after making the comments described above, he found narcotics in the driver's compartment: "[o]h, there you go. There's all the drugs right there." Additionally, by Burgess' own testimony, once he located the drugs, he ceased examining the driver's compartment. Thus, the record supports the conclusion that Burgess was searching specifically for narcotics. Accordingly, even assuming that the officers possessed reasonable, articulable suspicion for a protective sweep, they exceeded the permissible scope of a sweep, and thus the trial court did not err in suppressing the recovered drugs. *See generally Knight v. Commonwealth*, 71 Va. App. 771, 783-87 (2020) (affirming trial court's finding that an "inventory search" of the defendant's car was in fact an improper investigatory search for contraband, based in part upon officers' conversations and actions depicted in their body camera footage).

- 14 -

## III. CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in granting Hendrick's motion to suppress the evidence recovered from his car during a traffic stop.

*Affirmed.*