UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present:   Judges Ortiz, Raphael and Lorish
Argued at Fairfax, Virginia


DAQUAN ARTIS TINKER

MEMORANDUM OPINION* BY
v.        Record No. 1250-24-4            JUDGE DANIEL E. ORTIZ
FEBRUARY 24, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Robert P. Coleman, Judge

Reginald Henderson (The Henderson Law Firm, PLLC, on brief), for
appellant.

Kimberly A. Hackbarth, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General, on brief), for appellee.


Following a jury trial, Daquan Artis Tinker was convicted of two counts of robbery,

aggravated malicious wounding, and attempted capital murder.  The court also convicted him of

using a firearm in the commission of each felony.  On appeal, he argues that the trial court erred in

denying his motion to suppress the victim's in-court and out-of-court identifications.  Finding that

the victim's in-court identification had an "independent origin," we affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413.

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

On December 18, 2019, Edwin Cruz Moreno and his friend Israel Rivera went to the MGM National Harbor Casino in Oxon Hills, Maryland. Throughout the night, Moreno and Rivera gambled and had several drinks. While playing blackjack, Moreno won approximately $39,000. After cashing out, Moreno drove the pair back to Rivera's home. Upon pulling into Rivera's driveway, two men approached Moreno's truck and pulled him from the vehicle and began beating him. The assailants knew to search Moreno's pocket for money. After taking Moreno's winnings, the assailants shot Moreno in the arm and fled in a grey vehicle.

Moreno survived his injuries. A few hours after the attack, Detective Simmons interviewed him at the hospital. Moreno told the detective that "three guys" approached him as he was dropping Rivera off and they "hit [him] on [his] full body," "they got all [his] money," and "they were following [him]." Moreno stated that he knew "100 percent [the assailant] was in the casino" earlier in the night and that the assailants knew where his money was because the casino called attention to his winnings. When asked about the assailants' identities, Moreno described one suspect as a black skinny male in his early twenties with a "clean-shaven" face and "dreads." Moreno acknowledged that he did not see the suspect in the casino but stated "I know they have cameras. 100 percent. I know they follow me." When asked about the car used in the robbery, Moreno said, "I don't know . . . everything was so fast . . . I don't recall much because I had to cover myself, cover my head on the ground."

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

A week later, Detective Simmons conducted a second interview. He asked Moreno if he remembered any further details. Moreno responded that after he cashed out his winnings, he tipped the dealer and recognized one of the assailants at the gambling table. He said he "remembered the face exactly" because it was the person who hit him on the head. Moreno also tendered a written statement detailing the attack including the grey SUV used by the assailants and the assailants' descriptions. The written statement noted that a person at the table looked at him when he tipped his dealer, but the statement did not explicitly say that the person at the table was the same individual who hit him over the head.

Police arrested Tinker and two co-defendants. On August 19, 2020, Tinker and a co-defendant appeared for a preliminary hearing. An hour before the hearing, the lead prosecutor, Mr. McClain, met with Moreno and Rivera to show them video footage from the casino "to make sure that they would be able to authenticate the photos of them being at the casino that night." The footage included a clip of Moreno and Rivera entering a casino bathroom and two individuals following them. Then, the prosecutor showed Moreno two photos—one of each defendant.

McClain summarized the meeting in an email to defense counsel stating that "while looking at the photo, Mr. Moreno spontaneously remarked that he saw one of the people that robbed him in the casino, pointing to Mr. Tinker." The email also stated that Detective Simmons was present at the meeting and he

> stated that he considered doing a photo lineup with Mr. Moreno, however, Mr. Moreno stated to him that he wasn't sure whether or not he could identify the people who robbed him and that he had been drinking that evening so Det. Simmons opted not to show Mr. Moreno a lineup.[3] Det. Simmons said that the only information he gave to Mr. Moreno about the investigation when he talked to him was that the casino had excellent surveillance

---

[3] The parties stipulated at trial that Moreno's "blood alcohol range was from a .15 BAC to a .18 BAC."

cameras and that the people who robbed him followed him to the house when Mr. Moreno asked how the robbers knew he had the money and found him.

At the preliminary hearing, Moreno testified to the facts of the beating using an interpreter when needed. He said he observed two perpetrators and described one as tall and black and the other as thin with a beard. Moreno identified Tinker in court and in a photograph from the casino's video footage. He also identified Tinker in a video from the casino that showed Tinker and his co-defendants following Moreno and Rivera through the casino as they walked to the parking garage. He confirmed that a picture of Tinker's car from the casino parking lot was the "same color car, same size car" as the one in the robbery. When asked why his in-court description varied from his original statement to Detective Simmons, Moreno admitted that his original description was inaccurate due to the language barrier between himself and the officers.

Following the preliminary hearing, Tinker filed a motion to suppress Moreno's out-of-court and in-court identifications. At the motion to suppress hearing, McClain testified that he showed Moreno raw, unedited footage from the casino surveillance video and Moreno identified himself and Tinker as one of the assailants. McClain reiterated that he made no suggestions and was "very careful not to do so." Moreno also testified and explained that it took him over forty days to recuperate from the attack, and he began to remember more about the incident as he recovered. He confirmed that he was able to identify Tinker at the preliminary hearing with "one hundred percent" certainty and nobody had made suggestions to him about the identity of the assailants. Defense counsel asked Moreno how he recognized the defendants at the preliminary hearing, and he said that once he sat down and "saw them face to face, [he] recognized them." When asked if he recognized the defendants from the video footage shown before the preliminary hearing, Moreno replied, "I recognized them from the day they beat me up." Following Moreno's testimony, the circuit court denied Tinker's motion to suppress, concluding that the identification process may have been

unduly suggestive, but under the totality of the *Biggers*[4] factors, the out-of-court identification was not constitutionally flawed.[5]

At trial, the Commonwealth did not offer Moreno's out-of-court identification into evidence. Instead, Moreno identified Tinker in-court.[6] When asked how he recognized Tinker, Moreno explained that he saw the attackers faces "each time they struck [him]" and that he recognized Tinker "from hitting [him]." Moreno then testified that Tinker was "[t]he one that was taking money out of [his] pocket" during the attack. The jury found Tinker guilty of all charges, and this appeal followed.

ANALYSIS

Tinker argues that the out-of-court identification was "unduly suggestive" and that, as such, it tainted any in-court identification by Moreno. Assuming without deciding that the out-of-court identification was unduly suggestive and created a substantial likelihood of misidentification, the evidence supports a finding that the in-court identification was based upon the witness's observation of the defendant during the robbery.[7] Thus we find that the in-court identification was admissible.

When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth. *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019)

---

[4] *Neil v. Biggers*, 409 U.S. 188 (1972).

[5] The court observed that while defense had several potential issues for cross-examination, nothing about the identification justified suppression.

[6] Tinker did not object to the in-court identification at trial.

[7] "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 624 n.4 (2010)). The mechanism of "assuming without deciding" a particular issue facilitates this court's achievement of that goal. *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018).

(quoting *Carlson v. Commonwealth*, 69 Va. App. 749, 757 (2019)).  Our review includes "evidence adduced at both the trial and the suppression hearing."  *Carlson*, 69 Va. App. at 758 (quoting *Greene v. Commonwealth*, 17 Va. App. 606, 608 (1994)).  We give deference to the trial court's factual findings and review de novo the application of law to those facts.  *Joyce v. Commonwealth*, 72 Va. App. 9, 14 (2020) (quoting *Carlson*, 69 Va. App. at 758).  Tinker has the burden to show that the denial of his motion to suppress was reversible error.  *Commonwealth v. Robertson*, 275 Va. 559, 564 (2008).

A person charged with a crime based on an eyewitness' identification may have the identification excluded if the procedure used to procure the identification was so unduly suggestive and conducive to irreparable mistaken identification that he was denied due process of law.  *Stovall v. Denno*, 388 U.S. 293, 302 (1967).  Where the out-of-court identification is ruled inadmissible, an in-court identification is admissible only if it "has an origin independent of the inadmissible out-of-court identification."  *Wise v. Commonwealth*, 6 Va. App. 178, 186 (1988); *Hill v. Commonwealth*, 2 Va. App. 683, 693 (1986) ("even if evidence of the out-of-court identification cannot be admitted, an in-court identification may still be made if the origin of that identification is independent of the inadmissible out-of-court identification procedure").  "The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged."  *Walker v. Commonwealth*, 302 Va. 304, 315 (2023) (quoting *United States v. Domina*, 784 F.2d 1361, 1368 (9th. Cir. 1986)).

For example, in *Wise*, this Court found that an in-court identification specifically linked to an unduly suggestive out-of-court identification was inadmissible.  *Wise*, 6 Va. App. at 185. There, the victim's out-of-court identification was the result of a single photograph of the defendant shown to her by police officers.  *Id.* at 185.  At trial, when asked if she was certain that

the defendant was the perpetrator she said, "I could never say a hundred percent . . . but I, in my heart, I feel it was. I mean there's just something that when I saw the picture, it clicked." *Id.* at 186. The court found that the victim's in-court identification was "strongly tied to her out-of-court identification" and given that she could not give a description of the defendant's facial features after the robbery, the court could not conclude that the in-court identification originated independently. *Id.*

Here, the in-court identification made at the preliminary hearing and the later identification at trial stem from independent origins. Unlike the victim's testimony in *Wise*, Moreno did not link his in-court identifications of Tinker to photos or video footage of the defendant. Instead, he makes clear that he recognized Tinker from the night he was attacked. First, when asked if he recognized the defendants at the preliminary hearing from the video footage or photographs shown by McClain before the hearing, he replied, "I recognized them from the day they beat me up." Moreover, the trial court found that Moreno gave a detailed description of who he believed the assailant to be prior to viewing any footage from the casino. During the suppression hearing, the trial court noted that Moreno's written statement described Tinker "with some specificity" and "rehabilitated" inconsistencies in his original statement. Second, at trial, when asked how he recognized Tinker, Moreno testified that Tinker was the one "hitting" him and the one "taking money out of [his] pocket" during the attack.[8] While there is often a risk that an unduly suggestive out-of-court identification influences later identifications, here, there is affirmative evidence that Moreno's in-

---

[8]Additionally, Moreno's identification and description of Tinker was subject to extensive cross-examination during trial. Any inconsistencies in Moreno's description were properly before the jury. *See Smith v. Commonwealth*, 61 Va. App. 112, 119 (2012) ("'the jury, not the judge, traditionally determines the reliability of evidence,' particularly given the many procedural safeguards at trial 'built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability'" (quoting *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012))).

court identifications were based on his recollection of the attack.  Thus, the trial court properly

denied Tinker's motion to suppress.

CONCLUSION

Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*